[Crim. No. 13507.   Second Dist., Div. One.   Mar. 18, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GLORIA MARY DE LEON et al., Defendants and Appellants.

Ronald S. Tucker, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Tony Olvera and Gloria De Leon were convicted by a jury of possession of heroin for sale (§ 11500.5, Health & Saf. Code) and Maria Christina Guerrero, charged with them, of possession of heroin, a lesser necessarily included offense; Olvera was also convicted of furnishing Arthur Guerrero, a minor, with heroin (§ 11502, Health & Saf. Code), possession of an altered weapon less than 26 inches long (§ 12020, Pen. Code) and using force on a police officer engaged in the performance of his duties (§ 242, Pen. Code). Guerrero and De Leon appeal from the judgment; Guerrero's appeal was dismissed pursuant to rule 17a, California Rules of Court. Olvera appeals from the judgment and order denying his motion for a new trial. The appeal from the order is dismissed.

On August 17, 1966, Officer Fesler, Narcotics Division, and six other police officers not in uniform went to 659 South Concord Street; Officer Fesler had a search warrant in his possession. Two officers went to the front and four went with Fesler to the rear of the house; Officer Fesler held his badge in his left hand. He did not seek permission to enter the premises. The rear screen door was hooked and Officer Fesler "jerked" it open and entered an enclosed porch and a kitchen. No one was in the kitchen but he saw Maria Guerrero seated on a couch in the living room. He showed the badge in his left hand to Maria, then walked into the bedroom saying in a loud voice, "Police officers"; in the bedroom was Tony Olvera, Gloria De Leon and Arthur Guerrero. He stood with his back to the door of the bathroom to prevent anyone from flushing narcotics down the toilet. (Previously on June 23, 1966, he had talked to Olvera at the Black Bear Cafe at which time he identified himself as a police officer; he talked to him about 10 minutes.) Olvera, who had been bent over a tray "charged" Officer Fesler, struck him in the chest and knocked him backward into the bathroom half way into the

tub. Finally, Sergeant Brown pulled Olvera from Officer Fesler, but using Brown as a "crutch" Olvera raised both feet off the ground and kicked Officer Fesler in the chest causing him to fall across the bathtub and into a window breaking it out. Other officers assisted in subduing Olvera.

Officer Fesler first searched Arthur Guerrero; from his person he removed a balloon and plastic bag, each containing heroin. In the middle of the three persons who were in the bedroom was a TV tray on which was a plate on which were a quantity of heroin and several balloons. Officer Fesler took a balloon from the plate and using a funnel which was on the TV tray, poured the heroin into a balloon. On the tray were more balloons, a quarter measuring spoon with heroin still adhering to it, 12 toy balloons each containing one-quarter measuring spoon of heroin and a black box containing a hypodermic outfit consisting of two needles, two syringes, a razor blade and two blackened spoons; another razor blade was on the plate. A search of Olvera revealed a plastic bag containing 44 balloons of heroin which were knotted, tied and the ends cut off. On the floor in the bedroom was a balloon containing heroin. A sawed-off .22 caliber rifle was found under the bed —the muzzle to the center of the breech measured 9 inches and the overall barrel was 14½ inches; also in the bedroom were a shotgun and a loaded automatic pistol. When Officer Fesler entered the bedroom, De Leon was seated on the bed; a brown paper bag containing an open package of toy balloons and some balloons with a white powder residue were found on the bed next to her. Guerrero told Officer Fesler that Arthur was her son and was 17½ years old. When the gun was found, Olvera said, "That's not my gun. That gun belongs to the boy. He found it in the field." Upon their arrest, all defendants were advised of their constitutional rights. Arthur said, "The heroin is all mine"; the officer asked, "How about that stuff in Tony's [Olvera] pocket," and Arthur replied, "That's mine, too."

Officer Fesler testified that it was a common practice among narcotic peddlers in Los Angeles County to keep and provide paraphernalia and a place for injections for their customers; in his opinion, Olvera and Guerrero were not narcotic users but De Leon was a user. This opinion was based upon his familiarity with De Leon's past record and on his examination of her at the time of arrest. He further testified that among non-using sellers it was a common practice in Los Angeles County for them to use in their business people who

use narcotics in order to test the heroin to see if it is properly cut; heroin is sold in a diluted form, although it comes across the border in strengths from 90 percent down to 33⅓ percent; in order to "cut down" the heroin to the "3 to 5% that is normally sold on the streets," a non-using seller would have to have someone who is a user to tell him how much to cut it; it is customary for heroin sellers to provide a place for their customers to take injections.

For the defense, Arthur, a minor, testified that shortly prior to the entry of the officers, he found heroin (in balloons), a shotgun, rifle and a gun in the hills about a block from his house and took them home to show his parents; he put the rifle and shotgun under the bed, the gun in a bureau drawer and the heroin and the various items on the TV tray, and opened some of the balloons with a razor blade; he was showing the heroin to Olvera and De Leon when the police entered; his mother was in the kitchen; the officer ran into the bedroom around 1:30 p.m. (he did not know he was an officer since he did not display any badge or any type of identification), jumped Olvera and started fighting; Officer Fesler was the last to enter, after they were already arrested; Maria Guerrero is his mother and he never did get to meet his father, although he considered Olvera his father since he had been good to him; he did not know his father's name and never heard of Jose Antonio Guerrero and he never saw any other heroin in the house prior to August 17. Olvera testified that he was leaving the bathroom and going toward the bedroom to see what Arthur had found when the police entered; he started to fight "to defend his home" and the man he fought was not holding a badge; he had never met Officer Fesler at the Black Bear; the heroin and guns did not belong to him; he did not know the people in his house were police officers otherwise he would not have hit them; his name was not Jose Antonio Guerrero and he could not remember how long he had been Arthur's stepfather. Maria Guerrero testified that she was in the kitchen when the police arrived and did not see what occurred, the officers did not identify themselves; she did not see any of the evidence until the day of the preliminary hearing; Arthur was her son and his father's name was Jose Antonio Guerrero but she did not know his present whereabouts; Olvera began living with her a year after Guerrero left her; and the photograph of Jose Antonio Guerrero (Exh. 13) looks "a little bit" like Jose, and Olvera "looks like" Jose but they are not the same man.

On rebuttal Officer Eisenhart, a fingerprint expert, testified that he compared the fingerprints of Olvera with those of Jose Antonio Guerrero and that they were made by the same person. Officers Tusan and Brown testified that Officer Fesler was the first officer to enter the premises; as he went through the living room Fesler held his left hand in an upward position and said ''police officers''; when Officer Brown entered the hallway he saw Fesler being forced into the bathtub, went to his assistance and pulled off Olvera, as he did so Olvera, with his feet, again forced Fesler into the tub and up against the window.

De Leon and Olvera, by reference to De Leon's opening brief, contend that the unannounced forced entry of the police officers was in violation of section 1531, Penal Code,[1] thus the evidence seized on the premises should have been excluded.

Absent in the record is any testimony concerning any facts known to Officer Fesler before his entry sufficient to support a good faith belief on his part that compliance with the notice requirements of section 1531 would have increased his peril, frustrated the arrest or prevented a destruction of the evidence (*People* v. *Gastelo,* 67 Cal.2d 586, 588 [63 Cal.Rptr. 10, 432 P.2d 706]); and there is good reason for this. At no time on the trial level, in or out of the presence of the jury, was any objection raised to the admissibility of the evidence on the ground that the unannounced forced entry was illegal. While at the instance of the trial judge,[2] defense counsel at the time of the offer renewed *prior* objections made outside of the presence of the jury,[3] no objection was made on the ground now raised. Thus having raised no issue of the entry,

---

[1]Section 1531, Penal Code, provides: ''The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.''

[2]When the prosecutor offered the People's exhibits in evidence, the judge said, ''I take it each of the defendants would again renew their objections that had been made outside the presence of the jury?''; all counsel answered in the affirmative and the trial judge overruled the objections receiving all exhibits in evidence.

[3]In the absence of the jury, at the outset of the cross-examination of Officer Fesler, upon Fesler's refusal to disclose the identity of the informants who gave him the information set out in his affidavit on which the search warrant was issued, defendants moved to strike the officer's testimony, moved to suppress the evidence, objected to the officer's testimony, moved to quash the search warrant and moved to dismiss, all on the ground of the refusal of the officer to divulge the identity of the informers.

150

defendants gave the prosecution no opportunity to offer the necessary evidence and the trial judge no opportunity to make a ruling thereon. Appellants may not raise the issue for the first time on appeal. (*People* v. *Richardson,* 51 Cal.2d 445, 447 [334 P.2d 573] ; *People* v. *Hyde,* 51 Cal.2d 152, 157 [331 P.2d 42] ; *People* v. *Carter,* 192 Cal.App.2d 648, 661 [13 Cal.Rptr. 541].) Had timely objection been made, it is readily apparent from the affidavit on which the search warrant was issued that the prosecutor would have countered with evidence that the officer's failure to comply with section 1531 was completely justified.[4] (The warrant and affidavit were received (Exh. A) out of the presence of the jury for the limited purpose of "contesting the search warrant.") That Officer Fesler in good faith actually believed that his compliance with the notice requirements of the statute would have increased his peril is supported by the information contained in the affidavit, and is confirmed by Olvera's unprovoked attack on him and the finding of the firearms in the bedroom. Moreover, this justifies our belief that defense counsel intentionally failed to raise the issue of Fesler's entry knowing what the evidence would have shown. By their failure to object defendants led the prosecution into believing that there was no dispute concerning the validity of the entry.[5] It is obvious that at no time on the trial level did defense counsel consider this to be an issue or to have any significance to the defense—that all of the narcotics and firearms belonged to the minor.

[4]The affidavit reveals that Officer Fesler had been told by a reliable informant that De Leon, Olvera and Guerrero sold heroin from 659 South Concord, Los Angeles; that Olvera kept several guns in the house and carried a concealed weapon stating he would shoot any police officer that came to the house, as it "wouldn't be any worse to go for that" than the possession of narcotics; and that he had seen the weapons, a large rifle or shotgun and a smaller handgun. The affidavit was received *only* on the motion to quash the search warrant.

[5]On cross-examination defense counsel asked Officer Fesler "When you entered the premises did you knock or did you just open the door and walk in?"; he answered, "The screen was hooked." At this point the deputy district attorney (Mr. Boon) said, "Just a moment. It appears to me to be—if counsel wants to go into this it is perfectly proper, but I don't think it is a matter for the jury. *Entry.*" (Italics added.) The judge asked counsel if he was testing the officer's memory and recollection, to which he replied, "That is all, your Honor. The other matter [failure to divulge name of informant] was discussed out of the presence of the jury. I have no intention of bringing that up at this time." Mr. Boon then said, "I am wondering if they are raising the issue of 844?"; counsel replied, "No. I don't think 844 would be an issue in this case." (It is obvious that the prosecutor meant section 1531, Penal Code, instead of 844, and all counsel must have realized this; in any event, the notice requirements of both sections are substantially identical as are the exceptions to compliance. [*People* v. *Gastelo,* 67 Cal.2d 586, 588 [63 Cal. Rptr. 10, 432 P.2d 706]].)

At the outset of the cross-examination of Officer Fesler, outside of the presence of the jury, the officer under section 1881, subdivision 5, Code of Civil Procedure, refused to identify the informants who gave him the information contained in his affidavit upon which the search warrant issued. The defense then moved to strike the officer's testimony, suppress the evidence, quash the search warrant and dismiss the cause, and objected to the officer's testimony. After lengthy argument the motions were denied and the objection overruled. Relying upon *People* v. *McShann,* 50 Cal.2d 802 [330 P.2d 33], Olvera and De Leon contend that it was prejudicial error for the trial court to deny their motions and to admit Exhibits 2-12 in evidence; that had they the opportunity to cross-examine the informants "it could be discovered" that they observed nothing at all in their home, which would be consistent with their defense that the contraband and firearms were brought into the residence by Arthur shortly prior to the entry of police. This claim is entirely unsupported legally (*People* v. *McShann,* 50 Cal.2d 802 [330 P.2d 33]; *People* v. *Garcia,* 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366]) and factually.

In *People* v. *McShann,* 50 Cal.2d 802 [330 P.2d 33], the Supreme Court held as to the first count (sale of heroin) that the refusal to disclose the identity of the informant who had actually made the purchase of heroin for the police was erroneous because he had participated in the criminal act; and, as to the second count (possession of heroin), that disclosure was required because in the circumstances the informant was a material witness even though he neither participated in nor was an eyewitness to the offense charged. Defendant denied he received a telephone call from the informer and that he was in possession of narcotics; the prosecution had relied upon the recorded telephone conversation between defendant and the informer, the result of a call made by the latter from the police station, to show that defendant was en route to make a sale to the informant at the time of his arrest and, therefore, had knowing possession of the contraband. Said the court at pages 810-811: "Had there been disclosure, the informer might have testified that no such telephone call was made, that it was not defendant who received the call, that someone else was called, or that there was an entrapment. . . . Although the informer in the present case was not an eyewitness to the crime, . . . the prosecution's own election to introduce evidence of the telephone conversation made it

imperative that it disclose the identity of the informer, for he alone could amplify or contradict the testimony of the officers.''

In *People* v. *Garcia,* 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366], a search warrant was issued on the basis of an officer's affidavit containing information given to him by two informants that three persons were packaging and selling heroin and marijuana on certain premises. Thereafter the officer went to the apartment described in the warrant and made an unannounced forced entry. There they saw the three persons named in the affidavit and another, defendant Garcia; a search disclosed heroin and marijuana. Garcia, whose name was not included in the search warrant, testified that he was an addict and had come to the apartment only a half hour before the officers arrived to get a ''fix,'' and none of the narcotics belonged to him. The court held that an informer is considered to be a material witness even though he is not a participant in or a nonparticipant eyewitness to the criminal act if, under the circumstances of the case, nondisclosure would result in denying defendant a fair trial; and said that while the informants were neither participants in the alleged crime nor eyewitnesses thereto ''the relevant circumstances require that such informants be deemed material witnesses for the defense of defendant Garcia.'' (P. 838.) Continued the court: ''It is highly significant that the warrant and affidavit in support thereof related only to Raynas and Gomez, and that the affidavit alleged *inter alia* that both informants had made purchases of narcotics from such persons at their apartment, the scene of the search. These factors are consistent with the claim of defendant at trial that he was a visitor at the apartment who was there for the first time on the occasion of the search. More importantly, the indicated factors give rise to the distinct and substantial possibility that the informants could give direct evidence supportive of defendant's position. It is clearly quite possible, for instance, that such informants might have been possessed of information as to the quantity of narcotics kept by Reyna and Gomez at the apartment, as well as information relating to the place where such narcotics were cached. It is further possible that their acquaintance with the occupants of the apartment might have been of such a nature that they could testify as to who lived there during the period of time preceding the search. Certainly if testimony were produced to the effect that Gomez and the Reynas were the only residents of the apartment dur-

ing the indicated period of time, and that such residents kept heroin stored in balloons under the mattress where the narcotics were in fact found, such evidence would be highly relevant and material to defendant's contention that he was merely a visitor at the apartment who had come to get a 'fix.' " (P. 839.)

Contrary to the factual situation in *People* v. *McShann,* 50 Cal.2d 802 [330 P.2d 33], no information contained in the affidavit of Officer Fesler upon which the search warrant was issued was relied upon by the prosecutor on the issue of guilt. (The affidavit was received only on the motion to quash out of the presence of the jury.) Further, it is apparent from the affidavit[6] that the informers were neither participants in nor eyewitnesses to the crime of which defendants were convicted; nor does it appear therefrom, nor have defendants demonstrated (*People* v. *Garcia,* 67 Cal.2d 830, 839 [64 Cal.Rptr. 110, 434 P.2d 366]; *People* v. *Williams,* 51 Cal.2d 355, 359 [333 P.2d 19]; *People* v. *McShann,* 50 Cal.2d 802, 808 [330 P.2d 33]), that the relevant circumstances in the case require that the informers be deemed material witnesses on the issue of guilt and that nondisclosure of their identities would deprive them of a fair trial.

Defendants were not charged with their criminal activities of August 16, 1966. As to the offenses on August 17, 1966, the informers had neither been on the premises on that day, participated in defendants' activity, nor seen, known or related anything concerning the presence of contraband and firearms on the premises on August 17, 1966. Defendants have not demonstrated how the cross-examination of any of the informers could have helped their defense—that on August 17, 1966, the contraband and weapons belonged to and were brought to the premises by the minor. The affidavit for the search warrant, which names all of the defendants, establishes that had

---

[6]Officer Fesler's informant gave him the following information on August 16, 1966; that Christina Guerrero had 5 grams of heroin in balloons in her brassiere at 659 South Concord on the day before; that Guerrero, Olvera and De Leon sold heroin from this address 24 hours a day; that Arthur Guerrero would pick up a supply of heroin at a place a short distance away rented solely for keeping narcotics; that Olvera kept several guns, which the informer had seen, in the house; that if anything happened Olvera and Arthur agreed that Arthur would take the "rap"; that narcotics were injected in the kitchen and heroin packaged in the kitchen through a reserve quantity hidden outside; that De Leon carries in her brassiere heroin and resides at the address and that nearly all the prostitutes from Temple Street went there to buy their heroin.

Other informers told Fesler that "Tito" and "Olga" from Temple Street bought heroin from Olvera at that address.

154

the informants been called as witnesses their testimony could not possibly have been helpful to them for the matters therein set forth are in no way "consistent with the claim of defendant at trial," and give rise to no "distinct and substantial possibility that the informants could give direct evidence supportive of defendant's position," as in *People* v. *Garcia* (67 Cal.2d at p. 839 [64 Cal.Rptr. 110, 434 P.2d 366]). The additional claim of De Leon that disclosure was necessary because her defense was "that she was entraped," clearly an attempt to bring her case within the rule of *McShann* (50 Cal.2d at p. 810), is also without merit. The evidence herein in no degree supports a claim of entrapment and De Leon neither took the witness stand, presented any evidence on the issue (*People* v. *Benford*, 53 Cal.2d 1, 10 [345 P.2d 928]) nor raised the affirmative defense (*People* v. *Harris*, 213 Cal.App. 2d 365, 368 [28 Cal.Rptr. 766]) at trial; instead she preferred to rest on Olvera's defense that the contraband and firearms belonged to the minor. Had the jury believed Olvera and Arthur, it would have acquitted De Leon as well as Olvera.

▇▇ Citing section 834a, Penal Code,[7] Olvera claims that he did not know or have reason to know that Fesler was a police officer when he attacked him "to defend his home." The jury believed Officer Fesler's testimony that he exhibited his badge and identified himself, and that through a previous contact Olvera well knew he was an officer when he attacked him; and found against Olvera on this purely factual issue.

▇▇ Olvera's further claim that the instruction "A person being arrested by a peace officer has no right to resist with force or violence," in effect instructed the jury to find him guilty because it did not direct the jury to consider whether he resisted arrest with knowledge, or under circumstances that he should have known, that the person making it was a peace officer, is not only without merit but untimely made. Olvera was charged with battery under section 242, Penal Code, and the court's instructions properly explained the offense to the jury. In light of the whole instructions, the jury knew that its duty was to resolve the conflict in the evidence as to whether Olvera knew or should have known that Fesler was a peace officer, because his defense was that he did not know and the same was argued to the jury. Moreover, the

[7]"If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being arrested by a peace officer, it is the duty of such person to refrain from using force or any weapon to resist such arrest."

instruction of which Olvera now complains was submitted to him below and his sole objection was that he had a right to protect his home if he reasonably believed he was being attacked; he did not seek the modification he now urges and cannot complain about it for the first time on appeal. (*People* v. *Holbrook*, 45 Cal.2d 228, 233 [288 P.2d 1]; *People* v. *Robinson*, 180 Cal.App.2d 745, 752 [4 Cal.Rptr. 679].)

Olvera claims prejudicial misconduct of the prosecutor in connection with two incidents. In the light of the evidence we find no error and no prejudice to Olvera. The first relates to a photograph. During the cross-examination of Olvera, he denied that he was the man in the photograph of Guerrero (Exh. 13); then the prosecutor asked, "The man in the picture has a mole on his right cheek like you do, doesn't he?" at which time the objection on the ground that in view of his denial that he is the man in the photograph other questions would be argumentative, was sustained and the jury admonished to disregard the question and instructed among other things, that "a question is not evidence and it imports meaning only insofar as it gives meaning to the answer. An unanswered question is not evidence. No inferences should be drawn from an unanswered question." Mrs. Guerrero later testified that Exhibit 13 for identification looked a "little bit" like Jose Antonio Guerrero and that Olvera "looks like" Jose. Exhibit 13 was later received in evidence.

The second, also on the same issue of identity, involves fingerprints. After the photograph incident, the prosecutor informed the judge that on rebuttal he would have the fingerprint card of Jose Antonio Guerrero from the police files, and wanted the court to either order Olvera to submit to fingerprinting or permit the reopening of cross-examination so that Olvera could be asked if he would voluntarily submit in front of the jury. Thus, on recross-examination, the prosecutor asked Olvera if he would give a print of his right thumb for the purpose of determining his identity; his counsel objected. Then Olvera volunteered, "I will not refuse. Ask me the question. I volunteer to talk . . . ," but his counsel, after conferring with him, stated that he had instructed his client not to answer the question. Olvera's argument is that the prior arrest record of Guerrero should not be imputed to him and there was no significance in establishing that he and Guerrero were the same person.

At the outset, it should be noted that at all times the prosecutor disclaimed any interest in Guerrero's arrest record (it

156

showed no felony conviction); he wanted only to prove Olvera's true identity "To show the witness [Arthur] he [Olvera] called to testify for him is his own son, which he [Olvera] denies. . . ." Later, however, for the sole purpose of identity, evidence was received on rebuttal that the thumbprints of Olvera and Guerrero were made by the same person.

Arthur testified he found the contraband and firearms and brought them into the residence only minutes before the arrest; had his testimony been believed by the jury, all defendants would have been exonerated. Olvera, Arthur and Maria testified that Olvera was only Arthur's stepfather, and denied any natural relationship between them. The significance of the identification lies in the right of the prosecutor to impeach Arthur's testimony by showing his favorable bias toward Olvera based upon the relationship of father and son. (*People* v. *Sweeney*, 55 Cal.2d 27, 41-42 [9 Cal.Rptr. 793, 357 P.2d 1049].) ■ "It is well settled that it is proper cross-examination of a witness to show bias, prejudice, interest, hostility or friendship toward a party by showing that the witness 'cherished a friendly interest in appellant' which would bear upon the question of the credibility of her testimony." (*People* v. *Warren*, 175 Cal.App.2d 233, 241 [346 P.2d 64].) ■ Such cross-examination and request for fingerprints were relevant to the interest and credibility of Arthur and were not rendered improper merely because disclosure that Guerrero had been previously arrested would have resulted (*People* v. *Green*, 208 Cal.App.2d 410, 415 [25 Cal.Rptr. 398]); inasmuch as Olvera denied being Arthur's father it was proper on cross-examination for the prosecutor to seek his true identity and present his rebuttal evidence showing that Olvera was in reality Jose Antonio Guerrero.

■ Nor was it prejudicial error for the prosecutor to ask Officer Fesler, an expert on the use and sale of narcotics in Los Angeles, the grounds for his expert opinion that De Leon was a user; his answer was, "I was familiar with her past record and I examined her at the time after the arrest." The words "past record" were not stricken but the jury was admonished to disregard De Leon's past record in determining her guilt or innocence and instructed that it may consider it only for the purpose of determining whether, if she is determined to have possession of any of the narcotics, she "was in possession for the purpose of use. . . ." The reasonable inference from the officer's testimony that he considered her "past record" and his examination of her upon

arrest and determined she was a "user," was that the "past record" referred to her past record of "use" not sale. In this connection it was beneficial to De Leon because she was charged with sale; it gave the jury the opportunity to find, if it found she had possession of the narcotics, that she had possession for use, not sale. In any event, an expert is entitled to express his opinion and give his reasons in support of it. (*People* v. *Martin*, 87 Cal.App.2d 581, 584 [197 P.2d 379].)

The judgments are affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 15, 1968. Peters, J., was of the opinion that the petition should be granted.