[Civ. No. 36188. Second Dist., Div. Five. July 31, 1970.]

EDGAR HERBERT VICKERY II, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[Civ. No. 36206. Second Dist., Div. Five. July 31, 1970.]

PAULA McCOY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

(Consolidated Cases.)

## COUNSEL

Richtel & Nagin, Lawrence M. Nagin, Al Matthews and Arthur Shivell for Petitioners.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood and Eugene D. Tavris, Deputy District Attorneys, for Real Party in Interest.

## OPINION

SELBER, J.* — Paula McCoy and Edgar Herbert Vickery II are jointly charged in an information with a violation of section 11530 of the Health and Safety Code, possession of marijuana. They have filed separate petitions in this court seeking relief by way of mandate[1] from an order of respondent court denying their respective motions to suppress evidence pursuant to section 1538.5 of the Penal Code. Inasmuch as both defendants were arrested at the same time and place and the facts leading up to the arrest are identical as to each of them, we deem it appropriate to consolidate the petitions for decision in this opinion.

On the evening of August 21, 1969, Hollywood police division broadcast information to its officers concerning an armed robbery of a gasoline station that had just occurred. Descriptions of both the vehicle used in the robbery and of the suspect were furnished. The vehicle was described as a white 1968 Ford station wagon. Its license number was also provided. The broadcast further suggested that the suspect might be armed and might also possess an unknown amount of money taken in the robbery.

Shortly thereafter officers in a police patrol vehicle sighted a vehicle matching the description given on Laurel Canyon Boulevard and they requested the assistance of other officers in stopping the suspect in the vehicle. The vehicle was stopped at a distance variously estimated as three-quarters to one and one-half miles north of the residence of defendant McCoy who lived at 2184 Laurel Canyon Boulevard. Two other police patrol cars, having heard the radio request for assistance, arrived

---

*Assigned by the Chairman of the Judicial Council.

[1]Defendant Vickery's petition requests a writ of prohibition. In view of the fact that the petition is taken solely from the adverse ruling of respondent court on defendant's motion pursuant to section 1538.5 of the Penal Code we treat the petition as one for mandate.

at the scene shortly after the suspect was stopped. Officers Bitteroff and Macenas testified that they had overheard a conversation between the suspect and other officers in which the suspect advised that the vehicle was registered to defendant McCoy who lived down the street and that he desired that the vehicle be released to her rather than to have it impounded by the police.

At the hearing, pursuant to section 1538.5 of the Penal Code, held in respondent court some inconsistencies were developed between the appearance of the suspect and the description originally given in the broadcast. Also the station wagon did not have a luggage rack on top of it as initially suggested in the broadcast.[2] The suspect had neither money nor a weapon in his possession when stopped. The officers searched the area for a considerable time for either the money or a gun but without success.

Several officers then went to defendant McCoy's home. Allegedly their purpose in going there was to investigate her ownership of the vehicle, to determine if any confederate of the suspect might be in her premises, and also to see if either the weapon or the money had been left with her. They considered as a suspicious circumstance the suspect having chosen to leave Hollywood via a route which would take him directly past the home of defendant McCoy, to whom the suspect's vehicle was registered.

Officer Macenas, with two fellow officers, approached the front door of the residence. Officer Bitteroff, with one fellow officer, walked up several steps to the side of the single family structure, opened a closed gate and walked down a passageway to the rear yard of the house. There they took up a position a few feet from the rear door and next to the kitchen window through which they were able to make certain observations into the house. Their purpose in doing this was to block the escape route of the occupant or occupants of the house. None of the officers possessed either a search or arrest warrant.

Officer Macenas testified that another officer in his company at the front door knocked on that door. It was opened a few inches by defendant McCoy. Macenas heard defendant McCoy affirm her identity and her ownership of the vehicle. While the door was open he could smell the odor of burning marijuana. Defendant McCoy then closed the door. After about 45 to 90 seconds during which the officers in front considered what they should do, defendant McCoy again opened the door. The officers

---

[2]There were actually two broadcasts made after the robbery. They were not identical. The *precise* contents of each broadcast were not introduced at the hearing. The officers who testified could not recall if certain of the information they had received emanated from the first or second broadcast.

then observed that Bitteroff and his fellow officer were already within the house. They also entered.

Officer Bitteroff testified to his observations at the rear of the home. From his location he was able to observe the defendants participating in a candlelight dinner in the front room. He saw defendant McCoy go to the front door in response to a knocking thereon. After she held a brief conversation with the officers at the front door, which he could not overhear, he saw her close the door and then run through the living room and heard her say something about "cops" as she ran. Defendant Vickery then jumped up from his seat at the table and came running through the kitchen. As he approached the rear door, Bitteroff observed him throw a plastic bag with dark contents into a corner of the kitchen. Just as defendant Vickery exited from the rear door he was arrested by Officer Bitteroff and his confederate. The officers then entered the residence via the rear door. Officer Bitteroff arrested defendant McCoy as she was attempting to flush a marijuana cigarette down the toilet. He also detected a strong odor of burning marijuana. The plastic bag was retrieved from the kitchen and found to contain marijuana. Two or three hand rolled cigarettes containing marijuana were found on the table at which the defendants had been sitting. Officer Macenas found a small plastic bag containing what appeared to be marijuana on the branch of a small tree just outside the front of the premises. Defendant McCoy was then also arrested on the instant charge.

■■■ Defendants claim the evidence against them was obtained through an illegal search and seizure. Various subsidiary contentions are advanced to support this claim; however, as will be noted, each of these is not necessarily joined in by both defendants.

Both at the hearing held in respondent court and in her present petition, defendant McCoy through her counsel appears to have conceded the propriety of the officers' conduct in going to the front door of her home.[3] Defendant McCoy does however challenge the lawfulness of the officers' conduct in halting the subject vehicle and arresting its occupant insofar as it may have created a right for officers to go to the rear of her residence. Defendant Vickery takes the position that the officers lacked probable cause to go to the residence and that the evidence does not prove any consent by the suspect to the officers to go there. Suspect's consent, or lack of consent in that regard is immaterial.

The officers were entitled to rely upon the information received by them

---

[3] "Now, I'll concede the officer has a right to go up to the front door . . . ." "Their right, if any, was to go to the proper door and request interview." "It is conceded that the officers did have the right to go to the front door and inquire."

over the police radio in stopping the vehicle of the suspect. (*People* v. *Hogan* (1969) 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606] (reversed on other grounds in 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]); *People* v. *Dumas* (1967) 251 Cal.App.2d 613, 616 [59 Cal.Rptr. 541].) In *Dumas* it was held that an officer could detain an automobile based on information provided him at police roll call that a car bearing that license number had been involved in a forgery. Other cases have held that an officer receiving information over the police radio which describes a vehicle involved in a crime, together with its license number, may stop the vehicle, arrest or detain the suspect driver and inquire into the circumstances of his possession of the vehicle. (*People* v. *Hogan, supra; People* v. *Lumar* (1968) 267 Cal.App.2d 900, 904-905 [73 Cal.Rptr. 682].) Here, the officers had information concerning the year, model, color, body style in addition to the license number and the fact that the vehicle had recently been involved in an armed robbery. It was their right and their duty to stop the vehicle and to make further investigation.

The officers testified fully before respondent court as to the descriptions of the vehicle and the suspect, received by them over the radio. The defense developed certain inconsistencies between the description given over the radio and the observations of the officers. The vehicle stopped by the officers did not have a luggage rack on top of it. The suspect's hair was not black, as described in one radio broadcast. Certain differences in the clothing of the suspect were noted. These matters go to the weight of the evidence presented to the respondent court. We assume on review that the trial court in considering the description evidence presented by the People, found that evidence to be substantial. We agree.

In the course of their investigation at the scene of the detention of the suspect, the officers were advised by him that he desired that the vehicle be released to its owner, defendant McCoy, who resided only a mile away. Under these circumstances the officers were not required to impound the vehicle and were entitled to release it to the owner. However, they were not bound to accept the statement of the suspect that defendant McCoy owned the vehicle. It was legitimate to ask defendant McCoy if she did indeed own the vehicle before releasing it to her. We are not aware of any doctrine in the law which would require the officers to possess either probable cause or consent in order to go to the home of the defendant McCoy merely to make such an inquiry.

The principal question raised by these consolidated petitions is whether

the observations made by the officers through the kitchen window at the rear of the premises amounted to an unlawful search and seizure in that they were made from an area of defendant McCoy's premises where she was entitled to a reasonable expectation of privacy.

It. is conceded by the People that the officers did not have probable cause to arrest or search defendant McCoy when they approached her residence. It is also clear that in opening the fence gate which led to the back yard and in thereafter walking to the rear, the officers technically trespassed on that defendant's property. ■ However, it has been repeatedly held that the Fourth Amendment forbids unreasonable searches, not trespasses, and that a simple trespass without more will not invalidate a subsequent search or seizure. (*Cohen* v. *Superior Court* (1970) 5 Cal.App.3d 429, 434 [85 Cal.Rptr. 354]; *People* v. *Terry* (1969) 70 Cal.2d 410, 427 [77 Cal.Rptr. 460, 454 P.2d 36]; *People* v. *Seals* (1968) 263 Cal.App.2d 575, 579 [69 Cal.Rptr. 861].) ■ It is also well established that looking through a window does not constitute an unreasonable search. (*People* v. *Berutko* (1969) 71 Cal.2d 84 [77 Cal.Rptr. 217, 453 P.2d 721]; *People* v. *Willard* (1965) 238 Cal.App.2d 292, 297 [47 Cal. Rptr. 734]; *People* v. *Martin* (1955) 45 Cal.2d 755, 762 [290 P.2d 855].)

■ The problem is complicated however when there is present both a trespass and a window search together with a claim that the trespass amounts to a substantial invasion of a defendant's right of privacy. *People* v. *Willard, supra,* was one of the first California cases which discussed the subject. *Willard* reviews many prior decisions in which a trespass was factually involved. It concludes from such an analysis that essentially those cases "articulate no clear rule and reach no conclusion as to effect of a trespass on evidence thus obtained." (P. 301.) In attempting, itself, to formulate such a rule, the court in *Willard*, at page 307, states as follows: "We therefore reach this final conclusion: That looking through a window does not become an unreasonable search merely because a police officer may be on defendant's premises when he makes the observation; that the degree of privacy which defendant enjoyed in the place involved is an important factor in determining the reasonableness of the search; and that essentially the determination of its reasonableness must depend upon the facts and circumstances of the particular case. (*Bielicki* v. *Superior Court* . . . 57 Cal.2d 602, 605 [21 Cal. Rptr. 552, 371 P. 2d 288].)" In the later case of *People* v. *Berutko, supra,* 71 Cal.2d 84, 93, the court states: "Essential to the determination of reasonableness in cases wherein officers obtain probable cause for arrest through their own observations is a consideration of the degree of privacy

which a defendant may reasonably expect in a given enclosure occupied by him. . . . [Citations.]" In *People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], the court notes that in many cases involving a claim of unconstitutional search or seizure in open fields or grounds around a house, courts have based their decisions on whether or not the place was *a constitutionally protected area.* The court in *Edwards* (at p. 1100) states: "That phrase, however, does not serve as a solution in all cases involving such claims, and we believe that an appropriate test is whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion." Finally, in *Cohen* v. *Superior Court, supra,* 5 Cal.App.3d 429, 434, the court states: "The test to be applied in determining whether observation into a residence violates the Fourth Amendment is whether there has been an unreasonable invasion of the privacy of the occupants, not the extent of the trespass which was necessary to reach the observation point." In *Cohen* it was claimed that officers who looked into defendant's window from the platform of a fire escape located on the fourth floor of an apartment house violated defendant's right to privacy. The case was remanded to the trial court with directions to resolve the factual issue of whether the tenant might reasonably harbor an expectation of privacy under these circumstances.

In *People* v. *Bradley* (1969) 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129], the court held that marijuana plants found growing in a keg under a fig tree in a yard adjacent to defendant's residence could be admitted in evidence, where it could be inferred from the evidence that the plants were partially but not totally covered by the foliage of the tree, and that at least part of the plants were in plain sight of anyone within a foot of the tree. Although the plants were so discovered by officers in a rear yard, fenced to an undisclosed extent, and only a scant 20 feet from defendant's door, the court reasoned that inasmuch as deliverymen and others might come to this door and where occupants of another house in front apparently had access to the same yard, it would be unreasonable for the defendant to expect privacy as to the plants.

In *People* v. *Edwards, supra,* 71 Cal.2d 1096, officers discovered marijuana in a trash can located two or three feet from the back porch door of defendant's residence. Officers, without a warrant, had entered the open area of the backyard based on information secured from a neighbor. The

court held such evidence was not admissible because defendant's reasonable expectation of privacy was violated by unreasonable governmental intrusion. The court stressed that the trash can was only a few feet from the rear door and required trespass for its inspection, as the marijuana itself was not visible without rummaging in the receptacle.

In *Bradley* Justice Tobriner concurred in the decision but dissented on the issue of admissibility into evidence of the marijuana plants. It was his view that while mailmen, milkmen, trash collectors and the like might come to the rear door, the defendant could reasonably expect that such persons would stay in the vicinity of the rear door and not explore that area of the yard where the fig tree was located, some 20 feet away from that door. In comparing the court's decisions in *Edwards* and in *Bradley,* Justice Tobriner in his dissent at page 92 states: "The key similarity is that in both cases evidence in the backyard of a residence was not visible from the doorstep, walkway, or other place where visitors might be. It was, in short, located in a place where it was relatively safe from public intrusion, or so the occupant could reasonably believe. The trash can cannot logically be distinguished from the marijuana plants."

In our own analysis of *Edwards* and *Bradley* we note first that in *Edwards* the court placed stress upon the fact that the officer was required to rummage in the trash can before he found the marijuana. The inference is thus clear that if the marijuana had been located in plain view of the officer while he was in the backyard the evidence would have been admissible. Similarly in *Bradley* an inference can be drawn that Justice Tobriner would have agreed with the majority opinion if the marijuana plants were in plain view of those coming to the rear door of the premises. In each case the question of trespass by the officers in initially entering the yards is neither relied upon nor even discussed.

Under the facts of the instant case the officers went to both the front and the rear doors of the residence. We have already held that they had a right to approach defendant's home in order to investigate her ownership of the vehicle driven by the suspect. Under the facts as related here, we are aware of no limitation which would require the officers to approach the front door of the residence, rather than the rear door. If the observations of the officers objected to by defendants had been made through a window located adjacent to the front door, it seems clear under our law that evidence obtained thereby would be admissible. Are we then required to decide that because the observations were made through a window adjacent to the rear door such evidence would be inadmissible? In either situation the condition of plain view is one created by the occupant.

In *People* v. *King* (1965) 234 Cal.App.2d 423 [44 Cal.Rptr. 500], the

court states at page 432: "The fact that there was an uncovered portion of the window adjacent to the front door through which the officers could see into the living room was not brought about by any act on the part of the officers or third persons. (Cf. *People* v. *Regalado*, 224 Cal.App.2d 586, 589. . . .) The presence or absence of such an aperture was a matter within the control of the occupants of the house." And in *People* v. *Berutko, supra,* 71 Cal.2d 84, 91, the court stated: "Rather, the instant case involves observation by an officer from a place where he had a right to be and through an opening which *defendant* had provided through his arrangement of drapes covering his window."

The fact that the officers in going to the rear of the residence were required to lift the hook latch on the gate of a fence running along the side of the premises seems of little consequence. If in the course of his proper duties as a police officer, that officer is required to make an investigation at a private home, it would seem an unreasonable deterrent to the public's interest in that investigation, that it can be precluded by the mere existence of an unlocked gate. As noted above, *Bradley* permitted an entry into a fenced backyard by a police officer with little discussion of that point. And in *King* it was stipulated that the residence was surrounded by a picket fence about four and one-half feet high, having two gates. The front door approached by the officers in that case was 15 or 20 feet from the front gate. The observations made by the officer through a window near the front door were held not to constitute an invasion of defendant's right to privacy.

In this case it is true that the officers who went to the rear did not go there solely for the purpose of inquiry or investigation, that chore being left to the officers at the front door. However, their purpose in going to the rear was also stated as being to prevent the possibility that the occupant might attempt to escape through that door. In going to the rear door the officers possessed information that an armed robbery had occurred in Hollywood; that defendant McCoy's car had been involved in it; that the suspect driver had left Hollywood via a route which would take him past defendant McCoy's residence; that although a gun was used in the robbery and money taken from the victim, neither the gun nor the money was found on the suspect or in an area surrounding the place of his detention; that it was possible that more than one person may have been involved in the robbery; that perhaps the missing items might be within the residence. All of these reasons for going to the home were testified to by the officers. It does not seem to us an improper performance of police function to station officers at the rear of the home in the event defendant McCoy was indeed

involved and would attempt to escape. The later events point to the validity of this safeguard procedure by the police.

Other than in *Cohen, supra,* 5 Cal.App.3d 429, there appears to be no reported decision in this state holding that a "window search" constitutes an invasion of privacy. There are recent federal cases suggesting or holding that under the circumstances therein presented, observations made through a window of a residence constitute an illegal search. (*California* v. *Hurst,* 325 F.2d 891, 898; *Monnette* v. *United States,* 299 F.2d 847, 850-851.) The case of *Wattenburg* v. *United States,* 388 F.2d 853, although a curtilage rather than a residence was involved, contains language supporting a different holding than that which we arrive at in this opinion. However, these cases have been noted, but not followed, in *King, Willard* and *Bradley.* Each of these cases states the rule that while California courts are bound by decisions of the United States Supreme Court interpreting the federal Constitution, the decisions of lower federal courts thereon, although persuasive and entitled to great weight, are not binding.

While defendant Vickery raises objection based on *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], in his petition, counsel for both defendants, at the time of oral argument, conceded that the issue had not been raised by either in the court below. Our examination of the transcript of that hearing confirms this. An objection not raised in the trial court will not be considered for the first time on review. (*People* v. *De Leon* (1968) 260 Cal.App.2d 143, 149-150 [67 Cal.Rptr. 45]; *People* v. *Flores* (1968) 68 Cal.2d 563, 567 [68 Cal.Rptr. 161, 440 P.2d 233].)

Other points raised by petitioners do not require extensive discussion.

The evidence obtained as a result of the observations made by the officers clearly establishes independent probable cause for the arrest of each defendant.

The record does not reveal any undue limitation was placed on counsel for either defendant in their cross-examinations of People's witnesses.

The court was not required to take judicial notice of the proceedings in the case against the suspect not relevant to the action against the defendants herein.

There appears to have been no confidentiality attaching to the transcripts of the police radio broadcasts which would have precluded defendants from obtaining them by subpoena on their own initiative.

The alternative writs in *McCoy* v. *Superior Court,* 2d Civ. 36206 and *Vickery* v. *Superior Court,* 2d Civ. 36188, are discharged. The petition for writ of mandate in each said case is denied.

Kaus, P. J., and Aiso, J., concurred.

The application of petitioner McCoy for a hearing by the Supreme Court was denied September 24, 1970. Peters, J., was of the opinion that the petition should be granted.