Commonwealth, Appellant, *v.* Soychak.

Submitted November 8, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Louis H. Ceraso,* Assistant District Attorney, and *John N. Scales,* District Attorney, for Commonwealth, appellant.

*Richard H. Galloway,* for appellees.

OPINION BY JACOBS, J., March 24, 1972:

The present appeal concerns the admissibility of gambling evidence obtained from a police surveillance and raid of defendants' premises. The evidence was suppressed by the lower court following a hearing and the Commmonwealth now appeals.

The chain of circumstances leading to the present appeal began with a tip from a confidential informant. The informant advised the police that gambling operations were being conducted at the ABC Billiard Club. Acting on this information, police officers placed the club under surveillance for an hour, from 11:00 p.m. to midnight, during which time they observed various males entering and leaving the premises. The officers

later went to the rear of the building in which the club is located. The club occupies the second floor, which only extends over the front half of the first floor. Consequently, one of the officers was able to climb onto the first-floor roof over the rear half of the building and thereby obtain access to a louvered exhaust fan serving the club's bathroom. Peering through the louvers in the fan he observed a dice game being conducted in the club's billiard room adjoining the bathroom. The fan louvers were blown open by the fan sufficiently far to afford the officer a view of the bathroom and the adjoining billiard room, but he also lifted the louvers with his hand to get a better view.

On the basis of the above facts a search warrant was obtained. The affidavit supporting the search warrant included the following information: (1) a gambling establishment was alleged to be in operation on the described premises of the ABC Billiard Club; acquisition of this information was attributed to a confidential informant; (2) the "stickman" and "doorman" were identified, also through the statements of the confidential informant; (3) the information from the informant was said to be based on the informant's own personal knowledge, he having observed gambling, and actually gambled, on the premises in question; (4) the information from the informant was alleged to have proved reliable in the past; two convictions and three pending prosecutions for gambling, all the result of the informant's information, were set out in detail; (5) the results of the one-hour police surveillance were described; during this one-hour period various males were said to have entered the premises and two males from the premises were seen setting garbage on the street; (6) finally, the affidavit described the police officer's observation through the exhaust fan of gambling in the club's billiard room.

After obtaining the search warrant, the police officers proceeded to execute it. While two officers again observed the billiard room through the exhaust fan, other officers entered the building through the front door. As they began climbing the steps leading to the club, they noticed a man standing in the club's doorway at the top of the stairs. When the policemen identified themselves the man slammed the door. The police officers then identified themselves again and began beating on the door with axes and sledgehammers. After about ten minutes one of the defendants opened the door and the police officers entered.

During this time the troopers who were still on the rear roof observed the defendants through the exhaust fan. One of the troopers testified at the suppression hearing that he watched the defendants running around the room while the police were trying to open the front door. One of the defendants put billiard balls on the table on which they had been playing dice. Another defendant ran into the bathroom and flushed dice down the commode.

The items which the police confiscated as a result of the raid were a deck of cards, two curtain rods with tape on both ends, the exhaust fan, and the two reinforced doors that barred access to the club. This evidence, along with the testimony concerning the observations through the exhaust fan, was suppressed by the lower court. For the reasons that follow we affirm the lower court order with regard to the initial exhaust fan observations, but reverse with respect to the subsequent exhaust fan observations and the physical evidence seized.

Primarily, three issues are raised by this appeal. The issues concern the propriety of the initial police observations through the exhaust fan, the validity of the search warrant, and the admissibility of the evi-

dence obtained in the course of the subsequent police raid. These issues will be considered seriatim.

With respect to the propriety of the initial exhaust fan observations, the test is whether the police officer unreasonably violated defendants' justifiable expectation of privacy. *Katz v. United States,* 389 U.S. 347 (1967). The Supreme Court in *Katz* held that the absence of a physical intrusion does not per se demonstrate that a police surveillance was reasonable; even a non-trespassory surveillance can be unreasonable and therefore unconstitutional. As we intimated in *Commonwealth v. Hernley,* 216 Pa. Superior Ct. 177, 263 A. 2d 904 (1970), the presence or absence of an accompanying trespass is merely a factor to consider in determining the reasonableness of a visual intrusion. In the instant case the police officer's observations were effected by trespassing upon the roof of the building and manipulating the louvers of the billiard club's exhaust fan. This physical trespass accompanying the officer's visual observation is, therefore, a relevant consideration in determining the propriety of his conduct.

Another consideration which we found significant in *Hernley,* supra, is the reasonableness of the suspect's expectation of privacy. The suspects in *Hernley* had failed to curtain their windows, and accordingly we found that, absent such obvious action, their expectation of privacy was neither justifiable nor reasonable. In contrast, a reasonable expectation of privacy has been found to exist in cases wherein the suspects have drawn their curtains but in so doing have failed to completely block the view of police investigators. *See, e.g., Pate v. Municipal Court,* 11 Cal. App. 3d 721, 89 Cal. Rptr. 893 (1970); and *People v. Myles,* 6 Cal. App. 3d 788, 86 Cal. Rptr. 274 (1970), wherein the suspects were found, under the circumstances, to have exhibited

a reasonable expectation of privacy which was violated by unreasonable governmental intrusion.

In the present case the suspects could not have permanently closed the louvers on their exhaust fan without being deprived of the use of the fan. Hence, their failure to so close the louvers does not negate the existence of an expectation of privacy. And the defendants have in fact affirmatively demonstrated an expectation of privacy by their use of louvers which closed when the fan was not operating, their use of two reinforced doors, and their employment of a "doorman". This expectation of privacy may be considered reasonable with regard to the observations through the club's bathroom fan because a bathroom is a room ordinarily considered private and because a view of the particular bathroom in question was only accessible to a person standing on the roof.

Thus, we find that the defendants exhibited a reasonable expectation of privacy. This expectation was unreasonably violated by the trespassory intrusion of the police officer, as discussed above. This combination of circumstances leads us to the conclusion that the initial exhaust fan observations by the police officer were unconstitutional and accordingly the results thereof must be suppressed.

The second issue concerns the validity of the search warrant. The six parts of the affidavit supporting the warrant have been set out above. Part (6) of the affidavit is based upon the exhaust fan observations which we have already found to have been improper. However, the inclusion of illegally obtained evidence will not invalidate a search warrant if the warrant is also based upon other sources which are valid and sufficient to constitute probable cause. *Howell v. Cupp,* 427 F.2d 36 (9th Cir. 1970); *United States v. Sterling,* 369 F. 2d 799 (3d Cir. 1966); *Clay v. United States,* 246 F.2d

298 (5th Cir. 1957); *Merritt v. State,* 121 Ga. App. 832, 175 S.E.2d 890 (1970). Thus, if there are sufficient valid grounds in the present affidavit to constitute probable cause, the search warrant was properly issued.

The test for the sufficiency of a search warrant affidavit is twofold: the magistrate must be informed of some of the underlying circumstances (1) from which the informant concluded that the suspects were engaged in criminal activity, and (2) from which the affiant concluded that the informant was credible or his information reliable. *Aguilar v. Texas,* 378 U.S. 108 (1964). The second portion of this test is met in the present case by a showing that the informant is credible. Part (3) of the affidavit, summarized above, is a declaration by the informant against his interests in that he admits to having engaged in the criminal act of gambling. An even more significant indication of informant-credibility is revealed in part (4). The informant is therein shown to have proved reliable in the past by virtue of his having previously supplied information leading to two convictions and three pending prosecutions for gambling. These indices are sufficient to establish the credibility of the informant.

The other portion of the *Aguilar* two-pronged test, requiring a statement of some of the circumstances underlying the informant's conclusion, is not as easily satisfied in the present case. However, the requisite underlying circumstances are established by parts (1), (2), and (3) of the affidavit. These parts, all based on information from the confidential informant, aver that a gambling establishment was in operation at the billiard club (part (1)), identify the "stickman" and "doorman" (part (2)), and state that the informant had personally gambled, and observed gambling, on the club's premises (part (3)).

The crucial question concerning parts (1), (2), and (3) is whether they state the requisite underlying circumstances in sufficient detail. In this regard the Supreme Court of the United States has said the following: "The tip [received from a confidential informer] does not contain a sufficient statement of the underlying circumstances from which the informer concluded that [the suspect] was running a bookmaking operation. We are not told how the FBI's source received his information—it is not alleged that the *informant personally observed* [the suspect] *at work or that he had ever placed a bet with him. . . . In the absence of a statement detailing the manner in which the information was gathered,* it is especially important that the tip describe the accused's criminal activity in sufficient detail so that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States,* 393 U.S. 410, 416 (1969) (emphasis added).

The affidavit in the present case alleges criminal activity (gambling) on the part of the suspects, and indicates the manner in which the information was gathered (by personal observation). If either of these two items of information are stated in sufficient detail, then, by implication from the holding in *Spinelli,* supra, the affidavit is valid. *See, e.g., Merritt v. State,* 121 Ga. App. 832, 175 S.E.2d 890 (1970), which adopts the rule that the affidavit must either state how the informant obtained his information, or it must describe the criminal activity in sufficient detail. The purpose of these alternative requirements is to insure, as stated in *Spinelli,* supra, that the basis of the complaint is something more substantial than a casual rumor circulating in the underworld.

The question, then, is whether the affidavit in the instant case adequately indicates how the gambling information was obtained, in lieu of setting out in detail the exact nature of the gambling. We are of the opinion that the reference in the affidavit to the informant's eyewitness acquisition of his gambling information is a sufficient showing of how the information was obtained, considering that the informant had actually gambled and seen gambling on the premises in question, was able to identify the "stickman" and "doorman" of the gambling operation, and has been shown to be familiar with the legal meaning of "gambling" by his having previously supplied information leading to two convictions and three pending prosecutions for gambling. *See Commonwealth v. Payton,* 212 Pa. Superior Ct. 254, 243 A.2d 202 (1968), which held an affidavit valid under *Aguilar* which alleged as the circumstances underlying the informant's conclusion that the informant had personally placed bets with the suspect by telephone.

Thus, the "how-obtained" requirement is satisfied and the search warrant was validly issued. In addition, the alternative "detailed description" requirement is substantially complied with. The informant, in his presumably experienced opinion, described the activities in question as gambling. The word "gambling" has a commonsense meaning and should be construed accordingly, rather than in a technical fashion. *Commonwealth v. Payton,* supra. Additional specificity was added to the "gambling" description by the informant's reference to the "stickman" in the game, since the term "stickman" is ordinarily used in connection with a game of dice. *See* Webster's Third New International Dictionary 2241 (1965).

The third issue presented by the present appeal concerns the execution of the search warrant. In this

regard, no contention is made that the officers who entered through the front door acted improperly. Rather, the dispute is centered upon the activities of the officers stationed on the roof observing the defendants through the exhaust fan. We have already found that the pre-warrant observations through the fan were improper. However, a different question is presented by the subsequent observations from the roof while the warrant was being executed. So long as the subsequent observations were untainted by the pre-warrant observations, and they are otherwise proper, they are not rendered invalid by the impropriety of the observations made before the warrant was obtained. *Commonwealth v. Nicholls*, 207 Pa. Superior Ct. 410, 217 A.2d 768 (1966).

In determining the propriety of the officers' actions, we begin by noting that the police are not required to execute every warrant in identical fashion. Rather, they are permitted flexibility to adapt their execution procedures to fit the needs of particular situations. This is especially true of situations involving gambling wherein the evidence can be destroyed in a matter of seconds. *See, e.g., Commonwealth v. Jurkiewicz*, 47 Wash. Co. 172 (1967).

Under normal circumstances the police are required to give notice of their identity and purpose before attempting to enter private premises. *Commonwealth v. McCloskey*, 217 Pa. Superior Ct. 432, 272 A.2d 271 (1970). However, this notice requirement is designed not to afford the suspects time to destroy evidence, but to give them an opportunity to surrender their privacy voluntarily. Accordingly, if the suspects bar access to their premises after notice is given, and use the intervening time to destroy evidence, the police are then entitled to initiate their search by whatever means are reasonably available to them. In this connection the

case of *Vickery v. Superior Court,* 10 Cal. App. 3d 110, 88 Cal. Rptr. 834 (1970), is instructive. In *Vickery* five policemen, without a warrant and even without probable cause, went to the defendants' house as part of an investigation they were conducting. While three officers approached the front door, two other officers walked around the side of the house, opening a closed gate, and stationed themselves near the rear door. From their position they were able to observe through a kitchen window incriminating conduct on the part of the defendants after the defendants had been made aware of the identity and purpose of the police at the front door, but before the police had actually entered the house. The court found that under the circumstances the rear-door police were entitled to look through the kitchen window and that their observations through the window could properly be admitted into evidence. The instant case presents a somewhat similar situation. The search warrant gave the police a limited privilege to gain access, visual or physical, to the defendants' premises, subject to the restriction that they first reasonably announce their identity and purpose. After the front-door officers did properly announce themselves, the defendants barred access to their club and attempted to use the intervening time to conceal evidence. Since at that time the front-door officers were entitled to make an immediate search and seizure, it appears that the officers on the roof were likewise entitled to make a visual search of the premises through the exhaust fan. The observations which were thereafter properly made through the exhaust fan are not shown to have been tainted by the previous improper observations and so they are admissible as evidence against the defendants. In the present case, therefore, the officers may testify as to what they saw through

the exhaust fan after the policemen at the front door announced themselves.

With respect to the physical evidence seized by the officers entering through the front door, this evidence is admissible since it was seized during the proper execution of the search warrant.

That part of the lower court order suppressing the physical evidence seized and the observations made through the exhaust fan following the front-door police announcement is reversed. In all other respects the said order is affirmed.

CONCURRING OPINION BY HOFFMAN, J.:

I would like to note my specific concurrence with the majority's holding that any observations through the exhaust fan by the officers on the roof would be inadmissible unless made *after* the police at the front door announced their identity and purpose.