Filed 8/26/14

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICARDO LUJANO,<br><br>        Defendant and Appellant. | E057671<br><br>(Super.Ct.No. RIF10006447)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge. Affirmed in part; reversed in part with directions.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Scott C. Taylor and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

This case raises important questions about how police should react when they encounter someone in front of a house engaged in suspicious activity.  Here, police officers contacted and detained not only an individual in the driveway in front of a house, whom they observed stripping copper wire from an air conditioner, but also the occupant

1

of the house, suspecting that "maybe possibly" a burglary was in progress. The officers were aware of no facts particular to the occupant of the house suggesting that he was a burglar, rather than a resident. And they made no reasonable attempt to ascertain such facts until after he was detained. It was later determined he was in fact a resident.

The Fourth Amendment does not countenance warrantless intrusion by police into a private home and detention of a resident under the circumstances of this case. The police had no probable cause with respect to the resident of the house—who is the defendant in this case—so suspected exigent circumstances do not justify the officers' actions. As such, the detention was unlawful, and defendant's motion to suppress the fruits of that unlawful detention should have been granted.

## I. INTRODUCTION

Defendant Ricardo Lujano pleaded guilty to charges of possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 3), receiving stolen property (Penal Code,[1] § 496, subd. (a); count 4), and possession of a firearm by a felon (former § 12021, subd. (a)(1); count 5). A jury found him guilty of robbery (§ 211; count 1), and found true an enhancement for personally using a firearm during the commission of the robbery (§§ 12022.53, subd. (b), 1192.7, subd. (c)(8)).[2] The trial court sentenced defendant to 14 years 4 months in prison, as follows: a three year term on count 1, plus a

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] A second robbery count, count 2, was dismissed prior to trial.

consecutive 10-year term for the firearm enhancement; eight-month consecutive terms on counts 3 and 4; and a concurrent two-year term on count 5.

On appeal, defendant contends the trial court erred by (1) denying his motion to suppress evidence obtained in an allegedly illegal search and seizure, (2) denying his motion to sever the robbery charge from other charges, (3) denying his motion in limine to allow him to present evidence and argument that third parties were responsible for the robbery, and (4) failing to stay punishment on count 5, pursuant to section 654.

The People concede, and we agree, punishment on count 5 should have been stayed. Additionally, we reverse the trial court's denial of defendant's suppression motion, and vacate the judgment of conviction with respect to count 1 and the firearm enhancement.[3] We affirm the judgment in all other respects.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On the night of December 19, 2010, a liquor store in Riverside was robbed by two men wearing black hooded sweatshirts, gloves, and masks, one of whom was brandishing a handgun. The store was equipped with multiple surveillance cameras, which captured the robbery from various angles. One of the men—the one brandishing the firearm— appeared to be about six feet tall and to weigh about 300 pounds, while the second man was shorter (5 feet 8 inches, or 5 feet 9 inches tall) and thinner. From the surveillance video, police officers later identified the gun used in the robbery, which was never

---

[3] We therefore need not and do not address defendant's appeal of the denial of his motion to sever or the trial court's ruling on his motion in limine regarding evidence of third party culpability.

3

recovered, as a .38-caliber or .357 hammerless revolver. During the robbery, the two victims of the robbery—the store manager, and a friend who was at the store—were both sprayed in the face with pepper spray. Neither victim was able to identify either of the robbers.

On the afternoon of December 28, 2010, two Riverside police officers on patrol, Henry Park and Bryan Galbreath, observed a man in the driveway in front of a house stripping copper wire from an air conditioning unit that may have come from the residence.[4] The officers approached and spoke with the man, Albert Vargas, who said he was there visiting a friend named "Rick." Though Vargas did not know his last name, "Rick" was eventually identified as defendant. Vargas also admitted to being on probation "for narcotics." He explained he was stripping copper wire from the air conditioner because it no longer worked.

A side door that led from the driveway into the house was ajar—partially open, but not enough to walk through. Officer Galbreath approached the door and leaned inside, identifying himself as a police officer and commanding anyone in the house to come to the door.[5] Defendant responded, coming out from the bedroom area of the house

_____

[4] Officer Galbreath testified the air conditioning unit "appeared to have been taken from the residence," but nothing in our record suggests this testimony was based on any specific facts observed, rather than just the officer's suspicions as to what Vargas *might* have been doing. The court did not find that the air conditioner did in fact come from the house, but only that it "may be from the house."

[5] On cross-examination, Officer Park testified that Officer Galbreath went inside the house. This description of events is in some tension with Officer Galbreath's own testimony, that he remained in the threshold, "partially out, partially in," as he called for

*[footnote continued on next page]*

into Officer Galbreath's view, and then following Officer Galbreath's instructions to turn around and walk backwards out of the door, onto a concrete step. At that point, Officer Galbreath did not handcuff defendant, but took physical control of him ("had hands on him") and required defendant to keep his hands clasped behind his back. Officer Galbreath asked defendant for consent to search his person; defendant gave his consent. The search revealed a plastic bag of methamphetamine in defendant's pants pocket, at which point he was arrested.

Thereafter, defendant consented to a search of the residence, as did the owner of the home—who was, indeed, Vargas's mother—who was called to the location by police. The search of the residence revealed a nine-millimeter semiautomatic handgun (not the weapon used in the robbery), as well as a speed loader for a .38-caliber revolver. Police also recovered, as relevant here, a pair of shoes, three pairs of work gloves, two black hooded sweatshirts—one sized 2XL, the other 3XL—and two cans of pepper spray, one empty and one full. All of these items, with the exception of the smaller of the two sweatshirts, were found in defendant's bedroom.

One of the police officers involved in the search of defendant's home, Officer Jeffrey Adcox, had also participated in the investigation of the December 19th robbery, and had reviewed the surveillance video. Officer Adcox noted that defendant appeared to be about the same height and weight as the larger armed robber on the surveillance video.

_____

*[footnote continued from previous page]*

anyone inside to come out. This conflict in the evidence, however, is not dispositive of any issue in this appeal.

The officer also opined, based on further review of the surveillance video, that the shoes recovered in the search matched those worn by one of the robbery suspects, as did the gloves, pepper spray bottle, and black hooded sweatshirt. At the suggestion of Officer Adcox, Officer Park also reviewed the surveillance video, and reached similar conclusions regarding matches between items recovered and items viewed in the surveillance video, as well as noting the similarity in height, build, and facial hair between defendant and the larger of the two robbers.

Defendant moved to suppress all items recovered by police on December 28, 2010. After a June 27, 2012, hearing, the trial court denied the motion. Prior to trial, on October 23, 2012, defendant pleaded guilty to counts 3 through 5. The jury returned its verdicts with respect to count 1 and the firearm enhancement on October 26, 2012. The trial court imposed sentence on November 30, 2012.[6]

III. DISCUSSION

**A. The Trial Court Erred by Denying Defendant's Motion to Suppress, Requiring Reversal of the Judgment with Respect to Count One and Its Enhancement.**

The trial court denied defendant's motion to suppress all items recovered during the search of his residence, rejecting defendant's arguments that they were the product of an unlawful search and seizure. Defendant contends the trial court erred by denying the motion to suppress, and that the error requires reversal of the judgment of guilt as to all counts, including those to which he pleaded guilty. We find the motion to suppress

---

[6] Additional facts are provided below as necessary to address defendant's claims of error.

should have been granted, but this finding requires reversal only of defendant's conviction for robbery and the firearm enhancement, because he waived his right to appeal the remaining charges as part of his plea bargain, and he failed to obtain a certificate of probable cause.

1. *Standard of Review and Background Fourth Amendment Standards.*

"Federal constitutional standards generally govern our review of claims that evidence is inadmissible because it was obtained during an unlawful search." (*People v. Willis* (2002) 28 Cal.4th 22, 29.) "We defer to the trial court's factual findings where supported by substantial evidence, but we must exercise our independent judgment to determine whether, on the facts found, the search and seizure was reasonable under the Fourth Amendment standards of reasonableness." (*People v. Avila* (1997) 58 Cal.App.4th 1069, 1073-1074 (*Avila*) [Fourth Dist., Div. Two].) "On appeal, a correct decision must be affirmed even if the trial court based its ruling on an erroneous reason." (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1580.)

"'[T]he "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."'" (*People v. Camacho* (2000) 23 Cal.4th 824, 831.) "[W]arrentless arrests within the home are proscribed unless exigent circumstances exist." (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1132 [citing *People v. Ramey* (1976) 16 Cal.3d 263, 276].) The same proscription limiting warrantless arrests in the home has been extended to detentions that fall short of formal arrests. (*People v. Williams* (1979) 93 Cal.App.3d 40, 57, disapproved on other grounds by *Coito v. Superior Court* (2012) 54 Cal.4th 480.) Thus, the exception to the warrant requirement

7

for investigative detentions for the purpose of investigating possible criminal activity, approved in *Terry v. Ohio* (1968) 392 U.S. 1, "does not apply to in-home searches and seizures." (*U.S. v. Struckman* (9th Cir. 2010) 603 F.3d 731, 738 (*Struckman*).)

A warrantless arrest in a public place does not violate the Fourth Amendment so long as the police have probable cause. (*United States v. Santana* (1976) 427 U.S. 38, 42.) But to fall within the exigent circumstances exception to the warrant requirement, an arrest or detention within a home or dwelling must be supported by *both* probable cause *and* the existence of exigent circumstances. (*Struckman*, *supra*, 603 F.3d at p. 739.) A burglary in progress may constitute an "exigent circumstance," as that phrase is used in Fourth Amendment jurisprudence. (See *People v. Duncan* (1986) 42 Cal.3d 91, 97-98 (*Duncan*).) "Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person arrested has committed a crime. [Citation.] '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . .' [Citation.] It is incapable of precise definition. [Citation.] '"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt,"' and that belief must be 'particularized with respect to the person to be . . . seized.'" (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*).)

"'[I]n determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or "hunches," but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his

8

action was necessary.'" (*Duncan*, *supra*, 42 Cal.3d at pp. 97-98.) The standard to be applied is an objective one: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (*Brigham City v. Stuart* (2006) 547 U.S. 398, 404 (italics omitted).)

2. *Initial Contact in Driveway with Vargas Did Not Violate the Fourth Amendment.*

Defendant's arguments to the contrary notwithstanding, we find nothing unreasonable in the conduct of Officers Park and Galbreath during their initial contact with Vargas. Defendant's residence, including the driveway leading up to the front of the house, is surrounded by a low chain-link fence. He argues that the driveway constitutes "curtilage" subject to Fourth Amendment protections. Even assuming this to be so,[7] however, the officers were entitled to enter onto the driveway without a warrant to attempt to initiate a consensual conversation with Vargas, in addition to approaching the house to speak with any occupants. (See *U.S. v. Perea-Rey* (9th Cir. 2012) 680 F.3d 1179, 1188 [constitutionality of police incursion into curtilage depends on "whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home"].) To make contact with Vargas, the officers entered the driveway, passing through two gates that were either open or unlocked. In doing so, the officers exercised no more than "the same license to intrude as a reasonably respectful

---

[7] The People contend otherwise, asserting that the driveway area was not sufficiently private to be part of the home's curtilage.

citizen"—any door-to-door salesman would reasonably have taken the same approach the house. (See *People v. Thompson* (1990) 221 Cal.App.3d 923, 943.) Moreover, "[i]f in the course of his proper duties as a police officer, that officer is required to make an investigation at a private home, it would seem an unreasonable deterrent to the public's interest in that investigation, that it can be precluded by the mere existence of an unlocked gate." (*Vickery v. Superior Court* (1970) 10 Cal.App.3d 110, 119.)

Additionally, the officers were aware of sufficient particularized facts to reasonably believe Vargas was engaged in criminal activity. Officers Park and Galbreath observed from their patrol car that someone (later determined to be Vargas) was in the driveway, apparently stripping copper wire from an air conditioner. To be sure, an individual stripping copper wire from an air conditioner in front of a residence is not necessarily engaged in criminal activity. But it is hardly an unreasonable inference that such a person might well be, and in light of their experience, it is an inference the officers were entitled to make pending further investigation. Officers Park and Galbreath were justified in entering the driveway of defendant's home—even assuming it constitutes "curtilage"—to speak to Vargas and confirm or dispel their reasonable suspicion Vargas may have been engaged in criminal activity.

It should be noted, however, that nothing in our record indicates police ever had probable cause Vargas was engaged in burglary, as Officer Galbreath testified he suspected. The elements of burglary include entry into a building, along with the intent to commit a felony or theft. (*Magness v. Superior Court* (2012) 54 Cal.4th 270, 273; § 459.) Nothing in our record establishes that police had cause to believe Vargas ever

10

entered the house. Even assuming the air conditioner was stolen from the house—an assumption for which there is no evidence in our record—it may or may not have required entry into the building to remove the air conditioner to the driveway, where Vargas was discovered stripping it of copper wire. Nevertheless, with respect to Vargas, the officers—particularly once they determined he did not live at the residence—had probable cause to believe Vargas may have been engaged in some sort of illegal activity, including theft and trespassing.

In short, the officers did not violate the Fourth Amendment when they entered defendant's driveway to contact Vargas. Defendant's contentions in that regard are without merit.

*3. Warrantless Detention of Defendant Inside His Home, Absent Probable Cause, Violated the Fourth Amendment.*

Officer Galbreath's detention of defendant is more problematic than the officers' initial contact with Vargas. As discussed above, the officers were aware of specific, articulable facts about Vargas that led them reasonably to believe he might be engaged in theft and trespassing. In contrast, when police first contacted defendant, Officer Galbreath was aware of no specific, articulable facts *particular to defendant* suggesting that *he* might be involved in criminal activity. To the contrary, Officer Galbreath had reason to believe from his conversation with Vargas that a resident of the house named "Rick" might be inside—that is, someone who belonged in the house, and who if anything could well be a victim of theft by Vargas, rather than a fellow thief. Officer Galbreath never observed defendant doing anything suspicious, say, rifling through

11

drawers.  There is no evidence defendant acted aggressively or menacingly toward Officer Galbreath, or tried to flee.  Rather, defendant made his presence known when commanded to do so, and obeyed all police instructions after that point.

Neither did officers' observations outside the house prior to making contact with defendant yield any facts from which they could have reasonably concluded a burglar was likely inside.  As noted, when the officers talked with Vargas, he explained he was visiting a resident named Rick.  The officers may not have believed him, but "the explanation was not patently inconsistent, false, or inherently implausible.  As such, it did not furnish a reasonable basis for suspecting criminal activity" with respect to Vargas, let alone defendant.  (*People v. Loewen* (1983) 35 Cal.3d 117, 125.)  The officers observed a door was ajar, but there were no signs, for example, of forced entry.  (Cf. *Duncan*, *supra*, 42 Cal.3d at p. 98 [presence of a television and other property beneath an open window reasonably suggested burglars might still be in the house, "'collecting more loot'"].)  A partially open door by itself is not probable cause justifying warrantless search or seizure in a residence, and nothing in our record suggests Officer Galbreath was aware of any additional facts tending to suggest either a burglary in progress, or the presence of the victim of a burglary in need of emergency care.  (See *Murdock v. Stout* (9th Cir. 1995) 54 F.3d 1437, 1441 [officers did not have probable cause to enter a house based merely on neighbor's report of suspicious activity and an open door, but did have probable cause based on other signs a resident should have been home, but might have been in danger or injured], abrogated on other grounds as recognized in *LaLonde v. County of Riverside* (9th Cir. 2000) 204 F.3d 947, 957.)

12

The Ninth Circuit's opinion in *Struckman*, *supra*, 603 F.3d at p. 731, is instructive. In that case, police received a call from a neighbor that owners of a house were at work and a White male wearing a black jacket had thrown a red backpack over the fence and climbed into the backyard. (*Id.* at p. 736.) Police arrived, looked over a fence into the backyard, and observed someone fitting the description. (*Ibid.*) Officers "straightaway" drew weapons, ordered the man to his knees, and burst into the backyard, with one officer climbing the fence and another kicking open a padlocked gate, suspecting the man to be a burglar. (*Ibid.*) Police ignored his protestations that he lived at the house, he was detained, and he and his backpack were searched, revealing a gun, several unloaded handgun magazines, methamphetamine, and a "'digital gram scale.'" (*Id.* at pp. 737, 740, fn.7.) Only later, after the warrantless search and seizure at gunpoint, did police ask the man his name, at which point police were readily able to verify that the man was indeed in his own backyard. (*Id.* at p. 737.) He was later charged and found guilty of being a felon in possession of a firearm. (*Ibid.*)

The Ninth Circuit panel in *Struckman* doubted, but was willing to assume for purposes of argument, that the police were aware of just enough specific facts to amount to probable cause to believe the defendant was trespassing (though no probable cause to believe he was a burglar). (*Struckman*, *supra*, 603 F.3d at pp. 741, 746.) It found, however, that the probable cause "could easily have been dissipated by minimal inquiry at the outset, before the officers entered the backyard and searched and questioned [the defendant]." (*Id.* at p. 746.) On that basis, the warrantless seizure of the defendant in his own backyard was found to violate the Fourth Amendment, the denial of his suppression

13

motion was reversed, and the judgment of the conviction was vacated. (*Struckman*, *supra*, at p. 747.)

Here, as in *Struckman*, the police could have asked defendant "a few simple questions, such as 'What's your name?' 'Do you live here?'" (*Struckman*, *supra*, 603 F.3d at p. 742.) They did not. Put another way: Nothing in the record suggests that it was reasonably necessary for Officer Galbreath to do what he did—immediately detain everyone on the premises, and sort things out later—rather than engaging in even the most minimal inquiry as to defendant's identity, or verifying Vargas's story, before intruding into the house and detaining defendant. (See *Duncan*, *supra*, 42 Cal.3d at pp. 97-98.)

Moreover, perhaps unlike in *Struckman*, the facts here do not establish that Officer Galbreath had probable cause to believe defendant was committing *any* crime. There is nothing in the record establishing that Officer Galbreath, at the time he detained defendant, was aware of facts particular to defendant sufficient to "persuade someone of 'reasonable caution'" that defendant had "committed a crime"—nothing to support the belief defendant even was trespassing, let alone committing burglary. (*Celis*, *supra*, 33 Cal.4th at p. 673.) Officer Galbreath did not have a report from a neighbor identifying a man fitting a certain description was his suspect.[8] (*Cf. Struckman*, *supra*, 603 F.3d at p.

---

[8] Police later discovered that defendant's identification showed an old address, and therefore did not establish he lived at the address where he was arrested. This fact might have established probable cause to believe defendant was not authorized to be in the house, had police known of it prior to detaining him—at least until he could furnish

*[footnote continued on next page]*

14

736.) To the contrary, the only information Officer Galbreath had was that, according to Vargas, a person named "Rick" lived at the residence. But he failed to check whether defendant fit that minimal description before detaining him. We conclude that defendant's warrantless detention inside his residence lacked probable cause, and therefore violated Fourth Amendment.

The People's attempt to justify Officer Galbreath's actions turns on the notion that defendant was detained outside the home, arguing that Officer Galbreath "at most . . . briefly leaned in through the open doorway in order to call out for anyone inside to come out." This approach is apparently intended to avoid the limitations, discussed above, on warrantless arrests or detentions within a private home or its curtilage. But it is not an approach that is consistent with the law, as applied to the evidence in our record. "[I]t is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." (*U.S. v. Johnson* (9th Cir. 1980) 626 F.2d 753, 757.) At least as soon as Officer Galbreath ordered defendant to turn around and walk backwards towards him, suspecting defendant might be a burglar, defendant was detained. (See *In re Tony C.* (1978) 21 Cal.3d 888, 895 ["If [an] individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity, his Fourth Amendment rights are implicated . . . ."].) The record is unambiguous: Defendant was inside his house when he was detained, and therefore entitled to the full panoply of

---

*[footnote continued from previous page]*

some other proof of residency, for example, by calling the landlord (Vargas's mother) as police later did in seeking her consent to search the residence.

Fourth Amendment rights accorded to an individual in his or her residence or its curtilage. (See *Struckman*, *supra*, 603 F.3d at p. 738.)

The trial court found that the searches of defendant's person and of the house were consensual, colorfully commenting "They've got consent up the ying-yang here." This reasoning, however, focuses exclusively on the searches that followed defendant's detention, not on the detention itself. If Officer Galbreath had *invited* defendant to step outside of his home to talk, and defendant did so voluntarily, then any detention would be treated as if it occurred outside the home, and our analysis would be quite different. (See *People v. Tillery* (1979) 99 Cal.App.3d 975, 979-980 [where defendant voluntarily stepped outside of home to talk at invitation of police officer, subsequent warrantless arrest in driveway outside the home not treated as in-home arrest].) But that is not what happened. Officer Galbreath did not knock and politely invite any occupant of the house to engage in a consensual conversation; he ordered anyone inside to come out, and then commanded defendant to back his way out of the house. Defendant did not consent to this warrantless intrusion into his home.

In short, we do not doubt that the responding officers had a good faith suspicion defendant was engaged in criminal activity. That suspicion, however, was not supported by objective facts rising to the level of probable cause, as required to justify the warrantless detention of the resident inside a dwelling. As such, defendant's detention was in violation of his Fourth Amendment rights.

16

*4. Defendant's Motion to Suppress Should Have Been Granted.*

If consent is induced by an illegal arrest or detention, the illegality vitiates the consent and may require suppression of seized evidence unless attenuating circumstances dissipate the taint. (*People v. Leib* (1976) 16 Cal.3d 869, 877.) "[T]he general framework for analyzing a claim of attenuation under the Fourth Amendment is well settled. [Citation.] '[T]he question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' [Citation.] 'Relevant factors in this "attenuation" analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct.'" (*People v. Brendlin* (2008) 45 Cal.4th 262, 268-269.)

Here, however, the Attorney General has made no claim of attenuation, asserting no argument that, even if the detention was unlawful, the chain of causation from the unlawful conduct was somehow broken. Neither does our review of the record reveal evidence of any sufficient attenuating factors to remove the taint of defendant's unlawful detention from the evidence recovered by the police from his person and his residence. Defendant's consents to search were obtained immediately after the unlawful conduct, with no sufficient intervening events. Even if the police misconduct here was arguably not particularly flagrant, so far as unlawful warrantless seizures go—at least it was apparently motivated by good faith intent to interrupt illegal activity, though those

17

suspicions were not supported by probable cause—neither was the misconduct de minimis.

The circumstance that the owner of the home, Vargas's mother, consented to search of the house also does not cure the taint of defendant's unlawful detention or otherwise justify the search of the premises. "[T]he owners of a property may consent to a police search thereof as long as no other persons are legitimately occupying that property. [Citation.] . . . . [¶] But a landlord may not give valid third-party consent to a police search of a house rented to another." (*People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1200.) Virtually all of the evidence recovered by police was found in the portion of the house rented by defendant. As such, Vargas's mother could not give valid consent for the search that revealed the evidence at issue.

We conclude that all the evidence seized by police from defendant's person and from his home was the fruit of an unlawful detention, and the taint of the violation of defendant's Fourth Amendment rights was not dissipated by any attenuating circumstances. The motion to suppress should have been granted.

*5. Defendant Waived His Right to Appeal with Respect to Counts 3 Through 5, and Failed to Obtain a Certificate of Probable Cause.*

There is no doubt the evidence obtained as a result of defendant's warrantless actions was critical to his conviction at trial on the robbery charge (count 1) and the firearm enhancement. The Attorney General has not contended that any error in denying defendant's motion to suppress was harmless. The judgment of conviction with respect to those charges, therefore, must be vacated.

18

Defendant contends that the judgment should also be vacated with respect to counts 3 through 5, to which he pleaded guilty. He notes that section 1538.5, subdivision (m), provides that "a defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty."

Defendant's argument is foreclosed, however, by the circumstance that his plea agreement included a waiver of his right to appeal, and he failed to obtain a certificate of probable cause. *People v. Mashburn* (2013) 222 Cal.App.4th 937 (*Mashburn*) held that a defendant whose plea agreement includes a waiver of the right to appeal must obtain a certificate of probable cause to appeal a trial court's denial of a motion to suppress, notwithstanding section 1538.5, subdivision (m). (*Mashburn*, *supra*, at p. 940.) Defendant contends that *Mashburn* was wrongly decided, and urges us not to follow it. "We, of course, are not bound by the decision of a sister Court of Appeal. [Citation.] But '[w]e respect stare decisis, however, which serves the important goals of stability in the law and predictability of decision. Thus, we ordinarily follow the decisions of other districts without good reason to disagree.'" (*The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529 [Fourth Dist., Div. Two].) In this case, we find no sufficient reason to depart from the holding in *Mashburn*, which considered and rejected virtually the same arguments as defendant makes here—to the contrary, we agree with the *Mashburn* court's reasoning and conclusions.

**B.  The Sentence on Count 5 Should Be Stayed Under Section 654.**

The stolen property that defendant admitted to receiving by pleading guilty to count 4 is the handgun, recovered in the search of defendant's residence, that also serves as the basis for count 5, possession of a firearm by a felon.  Defendant argues that the court should have stayed the sentence on count 5 pursuant to section 654, because both counts 4 and 5 are based on "the same physical act of possessing the same firearm."  The People concede, and we agree, the court should have stayed the sentence on count 5.

Section 654 provides in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime."  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)

There is some authority for the proposition that section 654 does not necessarily preclude punishment for both receiving a firearm as stolen property and unlawfully possessing that firearm, on the theory that as to each offense the defendant may have had a "separate and distinguishable *mens rea.*"  (*People v. Taylor* (1969) 2 Cal.App.3d 979, 985-986.)  But defendant argues such reasoning is incompatible with the Supreme Court's decision in *People v. Jones* (2012) 54 Cal.4th 350, 358 (*Jones*), holding that "section 654 prohibits multiple punishment for a single physical act that violates different provisions of law."

20

We need not decide whether *Taylor* and similar cases have any continuing vitality after *Jones*. The trial court stated when taking defendant's plea that it was inclined to apply section 654, because they involved the same firearm, and acknowledged during sentencing that counts 4 and 5 related to "essentially . . . one [and] the same act." We agree with the People that the trial court implicitly found defendant harbored only a single intent, so the reasoning of *Taylor* could not apply. The sentence on count 5, therefore, should have been stayed, rather than imposed as a concurrent sentence. (*Jones*, *supra*, 54 Cal.4th at p. 353.)

## IV. DISPOSITION

The trial court's denial of defendant's motion to suppress is reversed, and the judgment vacated with respect to count 1 and the firearm enhancement of count 1. Additionally, the judgment is modified such that the sentence on count 5 shall be stayed pursuant to section 654. The judgment is affirmed in all other respects.

CERTIFIED FOR PUBLICATION

HOLLENHORST
Acting P. J.

We concur:

MCKINSTER
J.

CODRINGTON
J.

21