Filed 2/10/23  P. v. Sanchez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| THE PEOPLE, | C095235 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE001945) |
| v. | |
| ANGEL PINEDA SANCHEZ, | |
| Defendant and Appellant. | |

After receiving evidence that defendant Angel Pineda Sanchez sexually abused his minor daughter, Jane Doe, on multiple occasions, a jury found him guilty of three counts of oral copulation or sexual penetration of a child 10 years old or younger (Pen. Code, § 288.7, subd. (b))[1] and 10 counts of lewd acts on a child under 14 (§ 288, subd. (a)).  On appeal, defendant argues that (1) two of the lewd act convictions must be reversed

---

[1] Undesignated statutory references are to the Penal Code.

1

because the trial court improperly allowed the prosecutor to support those charges with inadmissible hearsay; (2) trial counsel provided ineffective assistance by failing to object to evidence of uncharged acts of violent nonsexual conduct by defendant; and (3) if we affirm his convictions, we nevertheless must remand the matter for resentencing in light of recent changes in California's sentencing law.

We reject defendant's first and second claims, but agree with his third claim. Accordingly, we will affirm the convictions and remand for resentencing.

## BACKGROUND

### I

*Prosecution's Evidence*

A. *Doe's Testimony*

1. *Sexual Abuse*

Born in 2001 and 19 years old when she testified at the 2021 trial, Doe grew up living with her parents and younger sister at several residences. When she was five years old, defendant used his fingers to touch Doe's vagina over her clothing two or three times a week. Starting when Doe was seven years old, on more than five occasions, defendant touched her breasts with his hands and mouth. He also made Doe put her mouth on his penis about three times, forcing her head down with his hand. This happened in the master bedroom of the family's home where Doe and her sister slept on the floor at the foot of their parents' bed.

At first, Doe did not tell her mother what defendant was doing because defendant said her mother would get upset. Doe eventually told her mother when she was seven. Doe's mother asked if she told anyone at school or any of her teachers and when Doe said she had not, her mother replied, "[O]kay. Don't tell anyone." Doe's parents subsequently discussed Doe's revelation and defendant stopped the sexual abuse of Doe. Though confused by her mother's command not to tell anyone, Doe trusted her mother

2

and complied, fearing she and her sister would be taken away by Child Protective Services (CPS).

Defendant first had sexual intercourse with Doe around six years later, in December 2014, when she was 13 years old. Doe was in eighth grade and dating a classmate. Defendant found out about the relationship and made Doe break up with her boyfriend. He warned her he was "going to have to check" her because he believed she was having sex with her boyfriend.

Some time later, defendant made Doe get in his SUV with him and drove to a local motel. Defendant parked in front of a room, took Doe straight inside using a key he already had, and locked the room door behind her. Defendant pushed Doe toward a bed telling her, "I told you, I was going to check you." Doe screamed, kicked, and told defendant to stop. But defendant took off her pants, put his fingers inside her vagina, then unzipped his pants and put his penis inside her vagina while she was on her back. Because this happened so close to Valentine's Day and her younger cousin's birthday, Doe recalled the date this happened: February 17, 2015. Afterward defendant took Doe to a nearby drugstore, bought yeast infection medication, and told her to use the medication at home because she had an infection.

Later, defendant took Doe to a Planned Parenthood location. Doe received a morning after pill, birth control pills, and condoms. Defendant told Doe to take the morning after pill.

Doe remembered clearly a later incident when defendant had sexual intercourse with her on the floor of the family's master bedroom when she was 13 years old. Doe was sleeping and awoke to find defendant removing her pants. Defendant then went into the bathroom, came back with lubricant, and put his penis inside Doe's vagina.

Doe's recollection was "really faint" regarding other incidents of sexual intercourse with her father in the master bedroom. "I don't want to give the wrong information," Doe explained to the prosecutor when testifying.

3

Asked if she recalled talking to police about a second act of sexual intercourse in the master bedroom, Doe said she did not. Over defense counsel's objection, the trial court allowed the prosecutor to show Doe a statement she made to police in December 2018. After reading the statement, Doe still did not recall the details but she remembered giving the statement to a Detective Lamb, had a clearer memory of the details when she made the statement (nearly three years before the trial), and was telling the truth when she made the statement.

Another incident Doe remembered occurred when she was 13 years old when defendant touched her sexually inside his SUV near the family's home. This alleged act served as the factual basis for count thirteen. "He wanted me to drive and I kept on telling him I didn't want to drive and then he got mad and started trying to -- well, not trying, he did touch me, and I just don't remember." The prosecutor asked if Doe remembered anything else, and Doe replied: "I don't remember the details. I'm trying so hard to forget everything. It's been so many years."

Doe remembered speaking truthfully to Detective Lamb about the event, which was fresher in her mind when she made earlier statements. But reviewing those statements on the witness stand did not help her remember the details. All Doe could recall was defendant "touching [her] and getting on top" of her. "It's just some parts are blurred to me right now," Doe explained.

Though defendant never threatened Doe explicitly, Doe did not resist the sexual abuse when she was 13 years old because she was afraid he would hurt her.

In spring 2015, Doe again told her mother what defendant was doing to her. Doe's mother said she would talk to defendant, who then stopped sexually abusing Doe. Concerned for her sister's well-being, Doe also told her sister about defendant, and advised her to wrap herself up in a blanket so it would be "really, really tight, and he wouldn't be able to put his hands through the blanket to touch" her.

4

One day in 2016, high school officials pulled Doe out of class and told her that her sister made a comment to a friend, and the friend told a teacher about defendant's sexual abuse. Doe denied it, afraid her mother would get in trouble, and that CPS would take her and her sister away and separate them from each other. But Doe did tell multiple high school friends about the past abuse, including her friends T. and J. She also told them she was worried about being separated from her sister if police found out.

One day in July 2016, the summer before Doe's sophomore year, defendant took Doe's phone. Worried defendant would see pictures of her boyfriend on the phone and try to have sex with her again, Doe ran away from home, eventually finding a place to stay at J.'s house. When J.'s mother demanded to know why she ran away from home, Doe told her defendant had sexually abused her. Doe allowed J.'s mother to disclose her situation to a friend who worked at CPS. That summer, police came to J.'s house, where Doe was still staying, and Doe spoke with them. Later, police returned and took Doe to a receiving home.

### 2. *Doe's Statements of Nonabuse*

In addition to her spring 2016 denial to school officials that defendant had sexually abused her, Doe had denied experiencing any sexual abuse twice before: (1) in 2015, when her father took her to the Planned Parenthood; and (2) in December 2014, when Doe's middle school required Doe to visit a mental health facility, in part because she was harming herself physically. Doe's mother and defendant were in the room when she denied any abuse at the mental health facility in December 2014, and defendant was in a different room of the Planned Parenthood in 2015 when Doe denied any abuse.

Both times, Doe denied being abused because she feared she and her sister would be taken away by CPS and her mother would get in trouble.

### 3. *Defendant's Acts of Nonsexual Violence*

Around Christmas 2014, defendant grabbed Doe by the hair, "smashed [her] into" the family Christmas tree, and hit her. On another occasion, Doe, her sister, and her

5

mother were playing bingo when defendant came home drunk and complained that no one had cooked for him. He took off his belt and hit Doe with it. Shortly before Doe ran away in summer 2016, defendant pointed one of his guns at her and her mother in a threatening manner.

B. *Doe's Friends and a Friend's Parent*

At trial, Doe's childhood friends T. and J. testified, as did J.'s mother.

T. befriended Doe in high school, but never went to Doe's home or met Doe's parents. Doe gave T. specific details about sexual things defendant did to her, beginning when she was around six years old. When Doe asked T. what to do "[a]bout midway through freshman year," T. encouraged Doe to tell the police. Doe told T. she was scared to.

J. met Doe in elementary school, and they reconnected during high school, after which Doe revealed to J. that when she was in kindergarten her father would "touch her" and "make her do oral" sex. Doe talked "[a]ll the time" about her fear of getting the police involved. J. explained Doe "did want something done about her situation, but we were all also scared about what would . . . happen" if she reported defendant.

In June or July 2016, Doe began living at J.'s house. At some point, J.'s mom learned about Doe's situation, and she contacted law enforcement. Law enforcement came to J.'s house shortly thereafter.

In an August 2016 statement to police, J. said Doe told her defendant sexually abused her at a hotel. J. did not mention how Doe arrived at the hotel. In a November 2018 statement to police, J. said Doe told her Doe was blindfolded on the way to the hotel.

J.'s mother testified she remembered Doe staying at her house in summer 2016. During that time, Doe told J.'s mother that defendant put his fingers and his penis in her vagina, and put his penis in her mouth. Doe also told J.'s mother defendant had taken her to a hotel. Though Doe asked her not to, J.'s mother called the police.

6

There were times that summer of 2016, J.'s mother explained, when Doe was asleep and "she would cry out a lot" saying, "[n]o, don't touch me . . . leave me alone. And then she would . . . shake all over and wake up" in a sweat.

C. *Doe's Husband*

Doe married the boyfriend she was dating in the eighth grade and whom defendant made her break up with in 2014. He and Doe reconnected in 2018, when they were both 18 years old. Doe did not talk much with him about what defendant did to her but one time, as they were driving, she pointed out the motel where defendant had sex with her.

Doe's husband explained at trial that almost every night in her sleep Doe "says, [n]o, please stop, and then she . . . tries to push something off her."

D. *Detective Lamb*

Detective Lindsey Lamb of the Sacramento County Sheriff's Office testified that a report prepared by a colleague who handled defendant's investigation before her noted that Doe had given the specific date of February 17, 2015, as the date defendant had sexual intercourse with her at the motel. In 2018, Detective Lamb and Doe went to the motel. Doe confirmed that was where defendant had sex with her in February 2015, and after looking at different buildings associated with the motel, Doe identified room number 14 as the room where it happened.

Later, when Detective Lamb asked the motel to look through its records for February 17, 2015, a motel employee sent to her a photo text image of People's exhibit 13, a registration card indicating rental of room number 14 on February 17, 2015. Also on the registration card was defendant's name and his family's home address.

Planned Parenthood records reviewed by Detective Lamb indicated that on a March 2015 visit, Doe obtained birth control pills, male condoms, and a morning after pill.

Detective Lamb testified that in December 2018 she recorded an in-person conversation with Doe, during which Doe told her about two instances when defendant

7

had sex with her at the family home. Regarding the *second* instance, Doe said "her mom and sister were outside or not present in the room where the incident occurred. This happened in her [parents'] bedroom." Doe was asleep on a bed on the floor next to her parents' bed, and she woke up with defendant's penis inside her vagina, and her pants down at her knees.

Doe also described a time defendant had sexual intercourse with her in a SUV: "[S]he and her dad were driving around. He was teaching her to drive. They were about one block from their house . . . . He forcibly placed his penis inside her vagina while they were inside the car."

E. *Motel Employee*

A long-time employee of the motel explained the motel's process for renting rooms. An employee fills out a registration form, and then has the renter sign the form. Information the form captures includes the renter's driver's license or other identification, the number of the room, and the date of the rental. The employee recalled providing business records to Detective Lamb after she contacted him asking about the motel's rental records regarding defendant. The employee confirmed that People's exhibit 13 was a copy of a registration record for room number 14 on February 17, 2015.

F. *Defendant's Other Acts With a Different 13-year-old Girl*

The prosecution's last witness, D., testified that in 2016, when she was 13 years old and living in Sacramento with her younger siblings, her mother was dating defendant, and they all took a trip to Reno. Everyone stayed in the same hotel room that had two queen beds. D. recalled falling asleep in the room with her siblings after her mom and defendant left to gamble in the casino. She began to wake up when she felt someone touching her buttocks and pulling down her pants. When she looked to see who it was, she saw defendant walking away.

A few weeks later, D. asked her mother to take her to get some food. Her mother declined, but defendant offered to take her. On the way to a restaurant in defendant's

8

truck, defendant placed his hand on D.'s thigh and moved his thumb back and forth for about five or 10 minutes. D. was scared and didn't say anything. Later, D. told a friend about defendant. The friend told others. Eventually the police got involved, and D. spoke with them regarding defendant about one week after the truck incident.

II

*Defendant's Testimony*

Defendant said he never touched Doe sexually and did not have sex with her. He admitted that when Doe was a teenager there was friction and arguing between them because he prohibited her from wearing makeup and participating in after school activities, and he did not want her to have a boyfriend. Doe ran away from home more than once, and defendant called the police because of it.

Defendant admitted he took Doe to the motel but he drove there only because he had left his phone inside a room he rented earlier that day to be with a prostitute and the motel was near the drugstore, where Doe asked him to take her to "buy some creams." Defendant testified Doe never went inside the motel room.

On cross-examination, defendant insisted there was never a time in the family's home that he was alone with Doe. He explained that he and Doe were not that close; they did talk to each other, but "not a lot." Defendant insisted that Doe asked him to take her to the drugstore the day he took her to the motel.

Defendant testified that after he had sex with a prostitute that day, he slept in the room for a while. When he went home he kept the motel room key and did not check out because he "didn't have to check out." He did return the room key and checked out after he retrieved his cell phone from the room, on the way to the drugstore with Doe. "It wasn't that important" to check out defendant explained, because the deposit he got back for checking out was only $5.

In interviews with police, defendant never mentioned that he rented a motel room, was with someone else there, and later took Doe there to get his phone on the way to a drugstore.

Defendant insisted he never did anything sexual with either Doe or D. They both testified dishonestly, he insisted.

### III

*Closing Argument, Verdicts, and Sentencing*

The prosecutor urged the jury to consider all the evidence that showed Doe's trial testimony was truthful, including (1) the motel records ("you don't just remember the exact date and the exact motel room for nothing"; Doe "remembered it because that was a very traumatic day in her life"); (2) Doe's husband's testimony regarding Doe's prior consistent statements and Doe's nightmares; (3) the testimony of Doe's two childhood friends T. and J. and J.'s mother regarding Doe's prior consistent statements and disinclination to contact authorities about defendant; and (4) J.'s mother's testimony about Doe's nightmares in summer 2016.

Defendant's "explanations for things just didn't make sense," the prosecutor argued. He refused to admit to ever being alone with Doe. "That's not reasonable." Given defendant's own testimony that he and Doe were not that close, it also did not make sense that Doe would proactively seek defendant's help when she had a female hygiene problem.

Though he spoke to police at length about Doe's accusations, defendant never told them he took Doe to a motel before taking her to the drugstore. The prosecutor continued: "That prostitute story [defendant] told you here on the stand is a boldface lie. . . . It doesn't make sense when you look at it with all the evidence. And he has never said it before. . . . If it happened like he said it happened, that she stays in the car, she never gets out, he runs in . . ., he runs into the room real quick, then runs to the office, to get his $5.00 deposit back, and then they leave. That would have been nothing, a blip, on

a 13 year old's radar.  No way.  There is no way she would have remember[ed] the exact date and the exact room. . . .  That story is a lie.  We know what [Doe] said is true."

Regarding D., the prosecutor argued:  "It is not a coincidence that we have multiple 13 year olds that the defendant is doing sexual things to. . . .  The law says, that if you decide that he committed . . . the acts to [D.], you may conclude that the defendant was disposed or inclined to commit sexual offenses.  And therefore, conclude that he was likely to commit and did, in fact, commit a charged offense."

Defense counsel urged the jurors to ask themselves why Doe's mother and sister did not testify, as they could have corroborated important aspects of Doe's testimony.  Counsel emphasized that Doe denied defendant abused her on multiple occasions, and argued that if defendant had sexually molested Doe, he never would have taken her to places where she could report it.  Counsel argued that the fact that defendant took her to the mental health clinic and Planned Parenthood was evidence he was not molesting her.  Defense counsel also argued that J.'s recollection that Doe told her she was blindfolded when defendant took her to the motel was "more consistent with a fabrication than . . . the truth."

The jury found defendant guilty on all counts as charged:  three counts of oral copulation or sexual penetration with a child under 10 years of age (§ 288.7, subd. (b); counts four, six & eight) and 10 counts of lewd acts on a child under the age of 14 (§ 288, subd. (a); remaining counts).

In October 2021, the trial court sentenced defendant to a determinate term of 20 years, consisting of the principal term of eight years (the upper term) for one of the section 288, subdivision (a) offenses, and consecutive two-year terms (one-third the middle term) for each of the remaining nine section 288, subdivision (a) offenses; and an indeterminate term of 45 years to life, consisting of three consecutive 15-year-to-life terms for the section 288.7, subdivision (b) offenses consecutive to the determinate term.  Pursuant to section 654, the trial court stayed the sentences for three of the section 288,

subdivision (a) offenses (counts three, five & seven) because they concerned conduct that "mirror[ed] the conduct that gave rise to the convictions" for the three section 288.7, subdivision (b) offenses.

As for its decision to impose the upper term for one of the section 288, subdivision (a) offenses, the trial court agreed with the probation report that defendant took advantage of a position of trust to commit the offense. (See Cal. Rules of Court, rule 4.421(a)(11).) Accordingly, the trial court found "the relationship between the defendant and the victim [was] sufficient for giving the upper term." The trial court observed the prosecutor "identified further factors that would weigh into" its decision to impose the upper term, and "adopt[ed] those" factors "as well, . . . although I don't believe they are necessary."

Regarding imposition of consecutive sentences, the trial court explained that because each offense was a "separate event[] . . . each should be dealt with independently of the other." Defendant timely appealed.

DISCUSSION

I

*Counts Twelve and Thirteen*

Defendant contends we must reverse his convictions on counts twelve and thirteen because the trial court abused its discretion in allowing the prosecutor to introduce inadmissible hearsay to support the charges. We disagree.[2]

A. *Additional Background*

In closing argument, the prosecutor explained that count twelve concerned the second time defendant had sexual intercourse with Doe at the family's home, and count thirteen concerned the sexual intercourse in defendant's SUV. Acknowledging that Doe had "a hard time remembering" details of both incidents, the prosecutor referenced

---

[2] Because we resolve defendant's claim on the merits, we need not address the People's contention that defendant forfeited this claim as to count thirteen only.

Detective Lamb's testimony concerning Doe's earlier statements regarding the two incidents.

    B. *Legal Background*

        1. *Evidence Code Section 1235*

Evidence Code section 1235 provides, in relevant part: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing." (Evid. Code, § 1235.) We review a trial court's decision to admit a hearsay statement under Evidence Code section 1235 for abuse of discretion. (*People v. Chhoun* (2021) 11 Cal.5th 1, 44.)

        2. *Relevant Case Law*

In *People v. Thomas* (2017) 15 Cal.App.5th 1063 (*Thomas*), a 25 year old who had been sexually abused by her father, the defendant, could not remember at trial whether her father had orally copulated her when she was younger than eight. A detective gave trial testimony recounting the survivor's earlier statements to him that the defendant orally copulated her when she was five, six, and seven years old. The appellate court rejected a challenge to the propriety of the detective's trial testimony, holding the detective's testimony was properly admitted under Evidence Code section 1235. (*Thomas*, at pp. 1066-1067, 1075-1076.)

The court explained the daughter's trial testimony that she did not recall the defendant committing the alleged acts against her when she was younger than eight years old was inconsistent " 'in effect' " with the earlier dates she previously told the detective. (*Thomas*, *supra*, 15 Cal.App.5th at pp. 1075-1076; *id.* at p. 1076 [" ' "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement [citation], and the same principle governs the case of the forgetful witness" ' "].)

C. *Analysis*

Defendant contends *Thomas* was wrongly decided, and distinguishable from the facts of his case. We are not persuaded.

First, defendant cites no authority disagreeing with *Thomas*, and our own research uncovered none. We decline to disagree with an uncontradicted opinion that is over five years old. (Cf. *Arentz v. Blackshere* (1967) 248 Cal.App.2d 638, 640 [declining to disagree with decisions that "stood without contradiction for seven years"]; see also *People v. Lujano* (2014) 229 Cal.App.4th 175, 190 [because stability in the law has value, an appellate court should be inclined to follow other appellate decisions absent " ' "good reason to disagree" ' "].)

Second, *Thomas* is apt authority for resolving defendant's claim. Here, 19-year-old Doe could not recall when testifying whether -- when she was 13 years old -- defendant had sexual intercourse with her at the family's home and in defendant's SUV. Detective Lamb gave testimony recounting statements Doe made nearly three years before trial that defendant indeed had sex with her on those occasions. "Doe's testimony . . . she did not recall defendant [having sex with] her" on those two occasions "was inconsistent 'in effect' " with what "she previously told" Detective Lamb. (*Thomas*, *supra*, 15 Cal.App.5th at p. 1076.) There was "in effect" an inconsistency between Doe's inability to recall at trial the details of the incident and the details about the incident that she provided to Detective Lamb years prior. Accordingly, this claim fails.

II

*Ineffective Assistance of Counsel Claim*

Defendant contends trial counsel provided ineffective assistance in failing to object to Doe's testimony regarding defendant's violent nonsexual conduct.

To establish a violation of a criminal defendant's constitutional right to effective assistance of counsel, a defendant must show "counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial." (*People*

14

*v. Seaton* (2001) 26 Cal.4th 598, 666, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." (*Strickland*, at p. 700.) Regarding the prejudice showing, a defendant must show "it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288.)

Here, even setting aside Doe's testimony of defendant's violent nonsexual conduct, the prosecution presented strong evidence defendant sexually abused her. In addition to Doe's firsthand accounts, the jury heard from (1) two of Doe's childhood friends and a friend's mother, who all testified that -- years before trial -- Doe revealed to them defendant sexually abused her but was reluctant to report it; (2) Doe's husband, who testified that when they drove by the motel, Doe told him that was where defendant had sex with her; and (3) the witness D., who testified about defendant touching her sexually when she was 13 years old. The jury also heard defendant's implausible testimony regarding the combination of coincidences that led him to drive with Doe to room number 14 of the motel on February 17, 2015: (1) though he and Doe were not close, she asked him to take her to buy some medication for her female hygiene issue; (2) he agreed, but decided to make a stop at the motel to retrieve his cell phone, which he left in a room he rented earlier that day to have sex with a prostitute; and (3) he still had the room key because he neglected to check out before.

Given this testimony, defendant's claim of ineffective assistance is unpersuasive because it is not reasonably probable that -- absent the evidence of defendant's violent nonsexual conduct -- the jury would have concluded defendant did not sexually abuse Doe. (Cf. *People v. Smith* (2011) 198 Cal.App.4th 415, 429-430 [rejecting a claim of ineffective assistance because it was not reasonably probable the jury would have concluded the defendant did not commit the relevant offense]; *People v. Zambrano*

15

(2004) 124 Cal.App.4th 228, 243 [harmless error in light of the defendant's "patently unreasonable" testimony].)

III

*Sentencing*

A. *Assembly Bill No. 518*

Defendant contends we must remand the matter to permit the trial court to exercise new sentencing discretion provided by Assembly Bill No. 518 (2021-2022 Reg. Sess.), which passed while this appeal was pending. (Stats. 2021, ch. 441, § 1.) The People agree the new law applies here, but contend remand is unnecessary because the trial court clearly indicated its intent to impose the maximum sentence. We agree with the parties that Assembly Bill No. 518 applies retroactively to defendant's nonfinal sentence, and we agree with defendant that we must remand the matter.

Effective January 1, 2022, "Assembly Bill 518 amended Penal Code section 654, subdivision (a) to provide, in pertinent part: 'An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision.' (Italics added.) Previously, where Penal Code section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. (Pen. Code, § 654, former subd. (a).) As amended by Assembly Bill 518, Penal Code section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Assembly Bill No. 518 applies retroactively to defendant's nonfinal sentence. (See *People v. Mani*, *supra*, 74 Cal.App.5th at p. 379.)

Defendants " 'are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of

16

the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

At defendant's 2021 sentencing, the trial court followed the relevant statutory dictate by staying the *shorter* sentences on section 288, subdivision (a) offenses because they concerned conduct that "mirror[ed] the conduct that gave rise to the convictions" for the three section 288.7, subdivision (b) offenses (counts four, six & eight). The trial court gave no other reason for selecting the longer terms. The trial court was "unaware of the scope of its discretionary powers." (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) Thus, the appropriate remedy is to remand for resentencing, unless the record clearly indicates the trial court would have imposed the same sentence " 'even if it had been aware that it had such discretion.' " (*Ibid.*; see *People v. Jones* (2022) 79 Cal.App.5th 37, 46 [though "not reversing any of [the defendant's] convictions or ruling that a portion of his sentence [was] invalid," the court "conclude[d] the need to apply" amended sentencing laws created sufficiently changed circumstances to warrant a full resentencing].) We see no such clear indication.

We agree with defendant that the People's observation the trial court imposed consecutive, rather than concurrent, sentences does not clearly indicate the trial court would have imposed the same sentence had it been aware of its newly granted discretion. The trial court imposed consecutive sentences because each offense was a "separate event[]" to be "dealt with independently." It does not necessarily follow that the trial court sought to impose the *maximum* punishment for each "separate event." We will remand for resentencing.

17

B. *Senate Bill No. 567*

Defendant further contends his upper term sentence on a section 288, subdivision (a) offense must be vacated in light of Senate Bill No. 567 (2021-2022 Reg. Sess.). The People argue any error by the trial court was harmless. Because we are remanding for a full resentencing, we need not resolve this claim. (See *People v. Jones*, *supra*, 79 Cal.App.5th 46 [given the nature of felony sentencing on multiple counts, at a full resentencing the trial court "should . . . be free to reconsider any other components of the aggregate sentence it crafted" previously].)

## DISPOSITION

Defendant's convictions are affirmed. The matter is remanded for a full resentencing.

/s/
BOULWARE EURIE, J.

We concur:

/s/
HULL, Acting P. J.

/s/
EARL, J.

18